# United States Court of Appeals for the Federal Circuit

---

**WILLIAM F. HARTMAN AND THERESE HARTMAN,**
*Plaintiffs-Appellants,*

**v.**

**UNITED STATES,**
*Defendant-Appellee.*

---

2011-5110

---

Appeal from the United States Court of Federal Claims in case no. 05-CV-675, Judge Margaret M. Sweeney.

---

Decided: September 10, 2012

---

KENNETH R. BOIARSKY, Kenneth R. Boiarsky, P.C., of El Prado, New Mexico, argued for plaintiff-appellant.

FRANCESCA U. TAMAMI, Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee. With her on the brief were TAMARA W. ASHFORD, Deputy Assistant Attorney General, GILBERT S. ROTHENBERG, and KENNETH L. GREENE, Attorneys.

---

Before D<span>YK</span>, O'M<span>ALLEY</span>, and R<span>EYNA</span>, *Circuit Judges.*

D<span>YK</span>, *Circuit Judge.*


William F. Hartman and Therese Hartman (collectively, "the Hartmans") appeal a decision of the United States Court of Federal Claims ("Claims Court") granting summary judgment to the government on the Hartmans' claim for a federal income tax refund. *Hartman v. United States*, 99 Fed. Cl. 168 (2011). Because the Claims Court properly determined that the Hartmans were not entitled to a refund, we affirm.

## BACKGROUND

This case requires an interpretation of the Treasury Regulations governing the constructive receipt of income, which in turn interprets section 451 of the Internal Revenue Code, imposing a tax on "[t]he amount of any item of gross income . . . for the taxable year in which received by the taxpayer."[1]  I.R.C. § 451(a). Under the Treasury Regulations, taxpayers computing their taxable income under the cash receipts and disbursements method must include as taxable income "all items which constitute gross income . . . for the taxable year in which actually or

---

[1]  *See Mayo Found. for Med. Educ. & Research v. United States*, 131 S. Ct. 704, 713 (2011) ("The principles underlying our decision in *Chevron* apply with full force in the tax context. . . . Filling gaps in the Internal Revenue Code plainly requires the Treasury Department to make interpretive choices for statutory implementation at least as complex as the ones other agencies must make in administering their statutes. We see no reason why our review of tax regulations should not be guided by agency expertise pursuant to *Chevron* to the same extent as our review of other regulations." (citing *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843-44 (1984))).

constructively received." Treas. Reg. § 1.446-1(c)(i). "Income . . . is constructively received by [a taxpayer] in the taxable year during which it is credited to his account, set apart for him, or otherwise made available so that he may draw upon it at any time, or so that he could have drawn upon it during the taxable year if notice of intention to withdraw had been given. However, income is not constructively received if the taxpayer's control of its receipt is subject to substantial limitations or restrictions." *Id.* § 1.451-2(a).

The question here is whether Mr. Hartman constructively received all shares of stock allocated to him for the sale of Ernst & Young LLP's ("E&Y") consulting business in 2000 (as originally reported) or whether he received only that portion of the shares which had been monetized (sold) in 2000 (as reflected in the Hartmans' amended return and request for a refund).[2]

I

The background of this dispute began in 1999. In late 1999, E&Y was preparing to sell its consulting business to Cap Gemini, S.A. ("Cap Gemini"), a French corporation. At this time, Mr. Hartman was an accredited consulting partner of E&Y. On February 28, 2000, E&Y and Cap Gemini devised a Master Agreement for the sale of E&Y's consulting business. Under the Master Agreement, E&Y would form a new entity, Cap Gemini Ernst & Young U.S. LLC ("CGE&Y"), and would then transfer E&Y's consulting business to CGE&Y in exchange for interest in CGE&Y. Each accredited consulting partner in E&Y,

---

[2] Although the transaction at issue in this case (the sale of E&Y's consulting business to Cap Gemini) involves only Mr. Hartman, both Mr. and Mrs. Hartman filed suit for a refund of taxes paid based on the transaction, as they filed a joint tax return in 2000.

including Mr. Hartman, would then receive a proportionate interest in CGE&Y. Each partner would terminate his partnership in E&Y, retaining his interest in CGE&Y. The accredited consulting partners would then transfer all of their interests in CGE&Y to Cap Gemini. In exchange for their respective interests in CGE&Y, E&Y and the accredited consulting partners were to receive shares of Cap Gemini common stock. The shares of Cap Gemini common stock would be allocated to each accredited consulting partner in accordance with his proportionate interest in CGE&Y. Additionally, each accredited consulting partner was to sign an employment contract with CGE&Y, which would include a non-compete provision. CGE&Y would then become the entity through which Cap Gemini would conduct its consulting business in North America.

As a part of the transaction described in the Master Agreement, each accredited consulting partner was also required to execute and sign a Consulting Partner Transaction Agreement ("Partner Agreement") between the partners, E&Y, Cap Gemini, and CGE&Y. Under the Partner Agreement, the Cap Gemini shares received by each accredited consulting partner would be placed into separate Merrill Lynch restricted accounts in each individual partner's name. The Partner Agreement further provided that for a period of four years and 300 days following the closing of the transaction, the accredited consulting partners could not "directly or indirectly, sell, assign, transfer, pledge, grant any option with respect to or otherwise dispose of any interest" in the Cap Gemini common stock in their restricted accounts, except for a series of scheduled offerings as set forth in a separate Global Shareholders Agreement ("Shareholders Agreement"). J.A. B-627. The Shareholders Agreement provided for an initial sale of 25% of the shares held by each

accredited consulting partner in order to satisfy each partner's tax liability in the year 2000 as a result of the transaction, and subsequent offerings of varying percentages at each anniversary following closing.[3] Although their right to sell or otherwise dispose of Cap Gemini shares was restricted, the accredited consulting partners enjoyed dividend rights on the Cap Gemini shares beginning on January 1, 2000, without restriction. The dividends earned on the Cap Gemini shares were not subject to forfeiture. Additionally, the accredited consulting partners had voting rights on the Cap Gemini shares held in the restricted accounts, though they provided powers of attorney to the CEO of CGE&Y to vote the shares on their behalf.

In addition to the restrictions on the sale of the shares, certain percentages ("forfeiture percentages") of the Cap Gemini shares were subject to forfeiture "as liquidated damages." J.A. B-628. The percentage of shares subject to forfeiture declined over the life of the agreement and expired entirely at four years and 300 days following closing.[4] In the period four years and 300 days following closing, the applicable forfeiture percentages of the shares would be forfeited if the accredited consulting partner (1) breached his employment contract

---

[3] The monetization schedule was later modified from annual scheduled offerings to "a more flexible approach that allows one or more transactions over the course of each year." J.A. B-682.

[4] The applicable forfeiture percentages were 75% prior to the first anniversary of closing; 56.7% prior to the second anniversary of closing; 38.4% prior to the third anniversary of closing; 20% prior to the fourth anniversary of closing; and 10% prior to the fourth anniversary of closing plus 300 days. At four years and 300 days following closing, the Cap Gemini shares were no longer subject to forfeiture.

with CGE&Y; (2) left CGE&Y voluntarily; or (3) was terminated for cause. *Id.* Additionally, where the accredited consulting partner was terminated for "poor performance," he would forfeit at least fifty percent of the applicable forfeiture percentage.[5] Notwithstanding the monetization restrictions and forfeiture provisions, the Master Agreement provided that the parties, including the accredited consulting partners, "agree that for all US federal . . . Tax purposes the transactions undertaken pursuant to [the Master] Agreement will be treated and reported by them as . . . a sale of a portion of the [CGE&Y] interests by . . . the Accredited Partners to [Cap Gemini] in exchange for the Ordinary Shares [of Cap Gemini]."[6] J.A. B-123-24. Cap Gemini was required to provide E&Y and each accredited consulting partner with a Form 1099-B with respect to its acquisition of the CGE&Y interests.[7] The Master Agreement also provided that "the parties agree that all [Cap Gemini] Ordinary Shares that are not monetized in the Initial Offering will be valued for tax purposes at 95% of the otherwise-applicable market price." J.A. B-555.

---

[5] Where a partner was terminated for "poor performance," a review committee comprised of senior executives selected by CGE&Y would determine an appropriate amount of forfeiture between 50% and 100% of the applicable forfeiture percentage.

[6] The Partner Agreement further provided that the accredited consulting partners "acknowledge [their] obligation to treat and report the Transaction for all relevant tax purposes in the manner provided in . . . the Master Agreement." J.A. B-624.

[7] IRS Form 1099-B, Proceeds From Broker and Barter Exchange Transactions, is the tax form on which sales or redemptions of securities, futures transactions, commodities, and barter exchange transactions are reported.

## II

In early March of 2000, E&Y held a meeting in Atlanta with all E&Y partners to discuss the details of the proposed transaction with Cap Gemini. Prior to the meeting, E&Y distributed a Partner Information Document, dated March 1, 2000, to its partners which summarized the Master Agreement and Partner Agreement, and purported to explain the tax consequences of the transaction as set forth in those agreements. The Partner Information Document provided that "[t]he sale of Consulting Services to Cap Gemini is a taxable capital gains transaction," and that the partners would be "responsible for paying [their] own taxes out of the proceeds allocated to [them]; however, [each would] receive funds from the sale of Cap Gemini shares for [their] tax obligations as they come due." J.A. B-726. The document further provided that "[t]he gain on the sale of the distributed [CGE&Y] shares is reportable on Schedule D of [each partner's] U.S. federal income tax return for 2000." J.A. B-727.

Mr. Hartman and the other E&Y accredited consulting partners signed the Partner Agreement prior to May 1, 2000, and the transaction closed on May 23, 2000. By signing the Partner Agreement, Mr. Hartman became a party to the Master Agreement and thereby "agree[d] not to take any position in any Tax Return contrary to the [Master Agreement] without the written consent of [Cap Gemini]." J.A. B-124. Mr. Hartman received 55,000 total shares of Cap Gemini common stock, which were deposited into his restricted account. Twenty-five percent of Mr. Hartman's Cap Gemini shares (necessary for payment of income taxes related to the transaction) were sold in May of 2000 for approximately 158 Euros per share, for a total monetization of $2,179,187 in U.S. dollars, which was deposited into Mr. Hartman's restricted account.

On February 26, 2001, Mr. Hartman received a Form 1099-B from Cap Gemini reflecting the consideration he was deemed to have received under the Master Agreement (a total value of $8,262,183), including a valuation of his unsold Cap Gemini shares at approximately $148 per share (reflecting 95% of the market value of the shares). On August 8, 2001, the Hartmans filed a joint federal income tax return for 2000, reporting the entire amount listed on the Form 1099-B (less cost or other basis) as capital gains income. Additionally, in filing its own 2000 federal tax return, Cap Gemini used the 95% valuation of the shares to determine the value of intangible assets to be amortized pursuant to I.R.C. § 197.[8]

### III

Following closing of the transaction, the value of Cap Gemini shares dropped drastically, from approximately $155 per share at closing to $56 per share by October 2001. Mr. Hartman voluntarily terminated his employment with CGE&Y on December 31, 2001.[9] Upon his departure, Mr. Hartman forfeited 10,560 shares of his Cap Gemini stock and received a credit for the taxes he paid on those shares in his 2000 tax return pursuant to I.R.C. § 1341, which provides for the computation of tax where a taxpayer restores amounts previously held under a claim of right. In December 2003, the Hartmans filed an amended federal tax return for 2000, claiming that they had received only the 25% of Cap Gemini shares that had been monetized in the year 2000, with the remainder being received in 2001 and 2002. They sought a refund of $1,298,134. The Internal Revenue Service ("IRS") failed

---

[8] Cap Gemini was later audited by the IRS, which conducted an examination of the transaction between Cap Gemini and E&Y, but did not make any adjustments to the tax treatment of the transaction.

to act on the Hartmans' claim for a refund, and on June 21, 2005, the Hartmans filed suit in the Claims Court against the government seeking a refund of taxes paid for 2000.

The Claims Court found that the Hartmans had constructively received all 55,000 shares of Cap Gemini common stock in 2000, and that the Hartmans had properly reported the gain from the transaction on their income tax return for 2000 and thus were not entitled to a tax refund. Accordingly, the court granted summary judgment for the government, and the Hartmans timely appealed. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3). We review "the summary judgment of the Court of Federal Claims, as well as its interpretation and application of the governing law, *de novo*." *Gump v. United States*, 86 F.3d 1126, 1127 (Fed. Cir. 1996).

DISCUSSION

I

The Hartmans' claim for a refund of taxes paid based on the transaction at issue in this case is not unique. Three courts of appeals have already squarely addressed the issue presented before us with respect to other similarly situated former E&Y accredited consulting partners. Each circuit to consider the transaction at issue here has concluded that the taxpayers were not entitled to a refund of taxes paid in 2000. *See United States v. Fort*, 638 F.3d 1334 (11th Cir. 2011); *United States v. Bergbauer*, 602 F.3d 569 (4th Cir. 2010); *United States v. Fletcher*, 562

---

[9]     Although Mr. Hartman ceased performing any duties for CGE&Y on December 31, 2001, he was permitted to remain an employee of CGE&Y through May 24, 2002 (following the second anniversary of closing) to allow him to reduce his applicable forfeiture percentage from 56.7% to 38.4%.

F.3d 839 (7th Cir. 2009).[10] As it argued before the Claims Court and the Fourth, Seventh, and Eleventh Circuits, the government contends that the Hartmans are not entitled to a tax refund for two reasons.

First, the government argues that under the *"Danielson* Rule,"* the Hartmans may not disavow receipt of the Cap Gemini shares in 2000 after having agreed to be bound by the Master Agreement which required them to recognize the shares as received in 2000 for the purposes of their federal income tax returns. The *"Danielson* Rule" takes its name from *Commissioner v. Danielson*, 378 F.2d 771 (3d Cir. 1967) (en banc), *cert. denied*, 389 U.S. 858 (1967), where the rule was described:

> [A] party can challenge the tax consequences of his agreement as construed by the Commissioner [of Internal Revenue] only by adducing proof which in an action between the parties to the agreement would be admissible to alter that construction or to show its unenforceability because of mistake, undue influence, fraud, duress, etc.

*Id.* at 775. Our predecessor court expressly adopted the *Danielson* Rule, *see Proulx v. United States*, 594 F.2d 832, 839-42 (Ct. Cl. 1979); *Dakan v. United States*, 492 F.2d

---

[10] Several district courts have also reached the same conclusion. *See, e.g.*, *United States v. Fort*, No. 1:08-CV-3885, 2010 WL 2104671 (N.D. Ga. May 20, 2010), *aff'd*, 638 F.3d 1334 (11th Cir. 2011); *United States v. Nackel*, 686 F. Supp. 2d 1008 (C.D. Cal. 2009); *United States v. Berry*, No. 06-CV-211, 2008 WL 4526178 (D.N.H. Oct. 2, 2008); *United States v. Bergbauer*, No. RDB-05-2132, 2008 WL 3906784 (D. Md. Aug. 18, 2008), *aff'd*, 602 F.3d 569 (4th Cir. 2010), *cert. denied*, 131 S. Ct. 297 (2010); *United States v. Fletcher*, No. 06 C 6056, 2008 WL 162758 (N.D. Ill. Jan. 15, 2008), *aff'd*, 562 F.3d 839 (7th Cir. 2009); *United States v. Culp*, No. 3:05-cv-0522, 2006 WL 4061881 (M.D. Tenn. Dec. 29, 2006).

1192, 1198-1200 (Ct. Cl. 1974), and we have consistently applied the rule in subsequent cases involving "stock repurchase agreements which contain express allocations of monetary consideration between stock and non-stock items," *Lane Bryant, Inc. v. United States*, 35 F.3d 1570, 1575 (Fed. Cir. 1994); *see Stokely-Van Camp, Inc. v. United States*, 974 F.2d 1319, 1325-26 (Fed. Cir. 1992).[11]

Here, the government seeks to extend the *Danielson* Rule to situations where the taxpayer agrees, not to the allocation of consideration, but to a particular tax treatment for the consideration, i.e., *when* the consideration is received by the taxpayer. Although the Claims Court recognized the *Danielson* Rule as "binding" in this circuit, it concluded that the rule is limited only to situations where "a taxpayer challenges express allocations of monetary consideration," rather than a situation where, as in this case, a taxpayer challenges how a transaction should be treated for tax purposes, and refused to apply the rule. *Hartman*, 99 Fed. Cl. at 181-82 (internal quotation mark omitted). In this appeal, it appeared that the parties differed as to whether the Hartmans were obligated under an agreement with Cap Gemini to report the shares of Cap Gemini stock as received in 2000, and we requested and received supplemental briefing on that issue.

---

[11]    For tax purposes, monetary consideration allocated to the purchase of stock is treated differently from monetary consideration allocated to the purchase of non-stock intangibles such as a covenant not to compete. While the amount allocated towards the purchase of stock is taxed as a capital gains transaction, "the amount a buyer pays a seller for [] a covenant [not to compete], entered into in connection with a sale of a business, is ordinary income to the covenantor and an amortizable item for the covenantee." *Danielson*, 378 F.2d at 775.

Second, the government contends that, although the shares were not actually received in 2000, Mr. Hartman nonetheless constructively received the shares in accordance with Treas. Reg. § 1.451-2. In addressing this issue, the Claims Court noted that "while the shares were held in the restricted account, Mr. Hartman could vote them and receive dividends from them," and therefore, "Mr. Hartman received all of the shares, for tax purposes, in 2000, when they were issued to him by Cap Gemini." *Hartman*, 99 Fed. Cl. at 187. The court further reasoned that "[t]he control that Mr. Hartman exercised over his Cap Gemini stock in 2000 was not defeated by the monetization restrictions and forfeiture conditions described in the transaction documents," because "Mr. Hartman voluntarily agreed to accept his share of the transaction proceeds with these limitations." *Id.* at 185. Thus, the Claims Court concluded that the shares of Cap Gemini stock were constructively received by Mr. Hartman in 2000.

Because we agree that Mr. Hartman "constructively received" the Cap Gemini shares in 2000 under the Treasury Regulations, we need not reach the questions of whether the agreements did in fact require the Hartmans to report the shares as received in 2000, and if so, whether the *Danielson* Rule could apply to situations where parties agree to a particular tax treatment.

## II

The constructive receipt issue turns on the interpretation of the constructive receipt regulation, Treas. Reg. § 1.451-2, and whether, under that regulation, Mr. Hartman constructively received all of his allocated shares of Cap Gemini stock in 2000.

We note initially that although the accredited consulting partners' right to "sell, assign, transfer, pledge, grant any

option with respect to or otherwise dispose of any interest" in the Cap Gemini common stock was restricted, the Cap Gemini shares here were set aside for each accredited consulting partner in a Merrill Lynch account in each partner's name, and the partners were able to receive dividends from and vote the shares (though subject to a power of attorney) during the period of time in which the sale of the shares was restricted. The risk of a decline in the value of the shares and the benefits of any increase in the value of the shares accrued entirely to the accredited consulting partners. Under the agreement, the shares immediately vested in the partners to ensure that the shares would not be treated as deferred compensation for future services.[12] Thus, the benefit of ownership of the Cap Gemini stock to each accredited consulting partner extended far beyond "the mere crediting [of the stock] on the books of the corporation."[13]

---

[12] The Hartmans rely on cases where income was placed in escrow or in trust with the understanding that specified amounts would be released to the taxpayer for performance of future services. These cases hold that, where the taxpayer could not elect immediate receipt, the income was not constructively received when placed in escrow. *See, e.g.*, *Drysdale v. Comm'r*, 277 F.2d 413 (6th Cir. 1960) (compensation paid by employer to trustee to be released to employee upon satisfaction of contractual employment obligations was not constructively received by employee until released). However, in the present case, the Hartmans (understandably) do not contend that the Cap Gemini shares held in the restricted accounts represent payment for Mr. Hartman's services in CGE&Y, since such an arrangement would result in taxation of the shares as ordinary income rather than as capital gains.

[13] The constructive receipt regulation states that "if a corporation credits its employees with bonus stock, but the stock is not available to such employees until some future date, the mere crediting on the books of the corpo-

It appears that the Hartmans make three arguments with respect section 1.451-2 of the Treasury Regulations. First, relying on the "or otherwise made available so that he may draw upon it at any time" language in the regulation, the Hartmans contend that the Cap Gemini shares were not constructively received when placed into Mr. Hartman's restricted account because he could not access them under the provisions of the Partner Agreement. But, as the government points out, constructive receipt extends to many situations in which the taxpayer cannot immediately draw upon the account. The quintessential example of constructive receipt covers the situation in which a taxpayer cannot, by his own agreement, presently receive an asset. *See Goldsmith v. United States*, 586 F.2d 810, 815 (Ct. Cl. 1978) ("[U]nder the doctrine of constructive receipt a taxpayer may not deliberately turn his back upon income and thereby select the year for which he will report it.").

Second, the Hartmans argue alternatively that at the time that Mr. Hartman entered into the Partner Agreement, he was not presented with the alternative option of receiving the assets free of restriction. But as discussed below, the existence of an opportunity to receive the assets at the time of escrow creation, i.e., free of all restrictions, is not a necessary requirement for constructive receipt. There is constructive receipt if the taxpayer exercised substantial control over the escrow account. Finally, the Hartmans urge that even if they are wrong as to their first two arguments, the accredited consulting partners did not have sufficient control over the shares to constitute constructive receipt. Relying on section 1.451-2 of the Treasury Regulations and our interpretation of that

---

ration does not constitute receipt." Treas. Reg. § 1.451-2(a).

regulation in *Patton v. United States*, 726 F.2d 1574 (Fed. Cir. 1984), the Hartmans contend that *Patton* held that there is no constructive receipt where a third party controls the right to receive the shares (or certificates). This last argument warrants some discussion.

In *Patton*, a subchapter S corporation determined to make a $346,000 distribution to its shareholders.[14] Because of its insolvency, the corporation was unable to make the distribution to the shareholders from its own funds and had to borrow the $346,000 to distribute to its shareholders. *Id.* at 1575-76. The corporation secured a loan from the bank and then purchased three certificates of deposit in the names of its shareholders (two for $115,000 and one for $116,000). *Id.* at 1576. The IRS claimed that the certificates represented dividend income to the shareholders in 1974, the tax year of the purchase of the certificates of deposit. The taxpayers claimed that the dividends would not be received until the certificates matured (upon the corporation's repayment of the $346,000 loan to the bank). The two $115,000 certificates were pledged as collateral for the loan, and thus "were never set aside for the individual benefit of the shareholders, but remained in the custody and control of the bank as collateral," and could not "have [been] delivered . . . to the shareholders had they so demanded." *Id.* (internal quotation marks omitted). The third certificate was made payable to the shareholders such that they could pay their federal income taxes on the distributed income. *Id.* On its federal income tax return for the year in which the certificates were purchased, the corporation reported that

---

[14] A "subchapter S corporation" is a small business corporation established under subchapter S of the Internal Revenue Code, I.R.C. §§ 1361-1379, in which "each shareholder is taxed upon his or her share of the corporation's income." *Patton*, 726 F.2d at 1575.

all the income had been distributed, while the shareholders failed to report receipt of any of the certificates as taxable income. *Id.*

We held that, while the third certificate was income to the shareholders, the two pledged certificates of deposit were not "constructively received" by the shareholders, reasoning:

> Although the [shareholders] may have become the owners of the [pledged] certificates of deposit when the bank issued the certificates . . . in the name of the [shareholders] . . . , at that time the certificates were not "unqualifiedly made subject to their demands" and the [shareholders] did not constructively receive them. . . . The [shareholders] did not constructively receive the certificates because, except for the receipt of the interest from the certificates, the [shareholders] could not have obtained or directed the distribution of the certificates.

*Id.* at 1577. We further noted that "it was far from certain that the [shareholders] ever would obtain the certificates, since the corporation's financial condition might result in its default on the loan and the bank's consequent foreclosure of the pledge of the certificates," *id.*, and "[t]he control and authority of the bank over the certificates of deposit . . . constituted 'substantial limitations or restrictions' upon the appellants' control over receipt of the certificates," *id.* at 1578.

The Hartmans contend that, as in *Patton*, Mr. Hartman did not constructively receive the shares of Cap Gemini stock in 2000 (except for those shares that were monetized) because his receipt of the shares was subject to "substantial limitations or restrictions," i.e., the distri-

bution of the shares was within the control of a third party.

However, the Hartmans' reliance on *Patton* is misplaced. Two significant features distinguish this case from *Patton*. First the restrictions were imposed by the taxpayer's own agreement and not by an agreement between the distributing corporation and a third party (the bank in *Patton*). Unlike *Patton*, Mr. Hartman and the other accredited consulting partners agreed to condition receipt of their shares on satisfaction of their own contractual obligations under the Partner Agreement and their employment contracts with CGE&Y. Under such circumstances, Mr. Hartman cannot now be heard to complain that such restrictions undermine his constructive receipt of the shares. The Claims Court rightly found that "Mr. Hartman voluntarily agreed to accept his share of the transaction proceeds with these limitations." *Hartman*, 99 Fed. Cl. at 185. The fact that Mr. Hartman voluntarily agreed to subject himself to the restrictions imposed by the Partner Agreement cannot defeat constructive receipt. *See Soreng v. Comm'r*, 158 F.2d 340, 341 (7th Cir. 1947) ("We can discern no rational basis for a holding that the dividends received by the [taxpayers] are not includable in gross income merely because they or [sic] their own accord entered into a contract with a third party as to the manner of their disposition when received."). As the Fourth Circuit in *Harris v. Commissioner*, 477 F.2d 812, 817 (4th Cir. 1973), noted when interpreting section 1.451-2 of the Treasury Regulations, "[s]ale proceeds, or other income, are constructively received when available without restriction at the taxpayer's command; the fact that the taxpayer has arranged to have the sale proceeds paid to a third party and that the third party is, with taxpayer's agreement, not legally

obligated to pay them to taxpayer until a later date, is immaterial."

Second, under the Partner Agreement, the conditions that could result in forfeiture were within the control of the accredited consulting partners themselves rather than within the control of Cap Gemini. In *Patton*, the shareholders had no control over their receipt of the certificates, and indeed may have never received them, due only to the corporation's failure to comply with its obligations to the bank, not due to any obligations of their own. Here, each partner had direct control over whether the shares would later be forfeitable. *See Fort*, 638 F.3d at 1341. The forfeited shares were characterized in the agreement as "liquidated damages," and were forfeitable only where partner breached his employment contract, left CGE&Y voluntarily, or was terminated for cause or poor performance, all circumstances over which the accredited consulting partners exercised control. *See* J.A. B-628.

Although the Hartmans contend that the determination of "poor performance" was within the control of Cap Gemini, the Hartmans have pointed to no evidence in the record to suggest that the "poor performance" clause could be utilized to terminate employees due to circumstances outside of the employees' control.[15] As the Eleventh Circuit recently noted, "the plain meaning of being terminated for 'poor performance' is not being terminated for any reason at all. Rather, poor performance clearly refers to unsatisfactory performance. It would be a strained interpretation . . . to hold that 'poor performance' does not

---

[15] Indeed, testimony presented before the Claims Court indicated that where employees were terminated due to a reduction in force (which was based on business necessity rather than performance), they did not forfeit any shares. *See* J.A. C-494-95.

really mean poor performance, but actually means 'any reason at all.'" *Fort*, 638 F.3d at 1342.

Other circuits, even before the Cap Gemini controversy, have held that where restrictions on receipt are imposed in order to guarantee performance under a contract, the income is nonetheless received when set aside for the taxpayer. *See Chaplin v. Comm'r*, 136 F.2d 298, 301-02 (9th Cir. 1943); *Bonham v. Comm'r*, 89 F.2d 725, 727-28 (8th Cir. 1937).[16]

In *Chaplin*, Chaplin, an artist, received two certificates of stock (167 shares each) in United Artists Corporation ("United") in 1928; however the certificates were immediately placed in escrow until 1935. 136 F.2d at 299. Under the terms of an agreement between Chaplin and United, Chaplin was required to deliver five motion picture photoplays to United. *Id.* at 301. Upon delivery of each photoplay, one fifth of the shares held in escrow were to be released to Chaplin. *Id.* The Ninth Circuit held that the United shares had been received by Chaplin when they were placed into escrow. Specifically, the court reasoned that "[o]ne nonetheless owns personal property because held by another to insure the performance of a contract." *Id.* at 302. Similarly, in *Bonham*, the Eighth Circuit held that where "stock was issued, the title passed then to [taxpayer], and the stock was retained as a pledge" to guarantee performance, the shares were taxable in the year that title passed to the taxpayer. 89 F.2d at 727.

The Hartmans contend that *Chaplin* and *Bonham* are inapplicable here because those cases were decided before the adoption of the constructive receipt regulation at issue here. *See* Republication of Regulations, 25 Fed. Reg.

---

[16]   *See also Fort*, 638 F.3d at 1339 (citing *Chaplin* and *Bonham*); *Fletcher*, 562 F.3d at 844 (same).

11,402, 11,710 (Nov. 26, 1960) (to be codified at 26 C.F.R. pt. 1). However, nothing in the regulatory history of section 1.451-2 indicates that the IRS intended to overrule the holdings of *Chaplin* and *Bonham*, and indeed, *Chaplin* and *Bonham* are consistent with the regulation. Notably, the IRS General Counsel Memorandum, issued after adoption of the constructive receipt regulation, cited *Chaplin* and *Bonham* with approval, noting that where "the taxpayer exercises a considerable degree of domination and control over the assets in escrow, the courts and the Service have generally held . . . that income is presently realized notwithstanding that the taxpayer lacks an absolute right to possess the escrowed assets." *See* I.R.S. Gen. Couns. Mem. 37,073 (Mar. 31, 1977). The language of the regulation is consistent with those cases, providing that "income is not constructively received if the taxpayer's *control of its receipt* is subject to substantial limitations or restrictions," i.e. that the "control" over receipt lies with a third party and not with the taxpayer. Treas. Reg. § 1.451-2(a) (emphasis added). In both *Chaplin* and *Bonham*, it was the *taxpayer's conduct* that determined whether he would receive the stock at issue, not a decision by a third party. The stock in *Chaplin* and *Bonham* was to be released to the taxpayer upon fulfillment of his contractual obligation, over which he exercised complete control. *See Chaplin*, 136 F.2d at 302; *Bonham*, 89 F.2d at 727-28.

We agree with the Seventh Circuit that here "[t]he sort of contingencies that could lead to forfeitures were within the ex-partners' control. That implies taxability in 2000, for control is a form of constructive possession." *Fletcher*, 562 F.3d at 845; *see also Fort*, 638 F.3d at 1342 ("[C]onstructive receipt was not impossible simply because [taxpayer] was required to forfeit the shares upon the occurrence of certain conditions, because [taxpayer]

had sufficient control over whether those conditions would occur."). By agreeing to condition release of the shares on continued employment with the corporation (a contractual obligation, satisfaction of which only he controlled), Mr. Hartman exercised control over his receipt of the shares.

In summary, under Mr. Hartman's own agreement, the Cap Gemini shares were "set aside" for Mr. Hartman in a brokerage account. Mr. Hartman received dividends from and was entitled to vote the shares in the year 2000. Mr. Hartman exercised control over his receipt of the Cap Gemini shares under the forfeiture provisions of the Partner Agreement. In light of these attributes of dominion and control, we conclude that Mr. Hartman constructively received all 55,000 shares of Cap Gemini common stock in 2000 when they were placed into his restricted account to guarantee his performance under his contractual obligations.

The Claims Court's decision granting summary judgment to the government on the Hartmans' claim for a refund of federal income taxes paid in 2000 is affirmed.

**AFFIRMED.**