# United States Court of Appeals for the Federal Circuit

---

**AUTHENTIC APPAREL GROUP, LLC, RON REUBEN,**
*Plaintiffs-Appellants*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

---

2020-1412

---

Appeal from the United States Court of Federal Claims in No. 1:15-cv-00016-MCW, Senior Judge Mary Ellen Coster Williams.

---

Decided: March 4, 2021

---

J. JOSEPH BAINTON, Amagansett, NY, argued for plaintiffs-appellants.

BORISLAV KUSHNIR, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee. Also represented by JEFFREY B. CLARK, ROBERT EDWARD KIRSCHMAN, JR., DOUGLAS K. MICKLE; JAMES MACKEY IVES, Military Personnel Branch, United States Department of the Army, Fort Belvoir, VA.

---

Before LOURIE, DYK, and STOLL, *Circuit Judges.*

LOURIE, *Circuit Judge.*

Authentic Apparel Group, LLC ("Authentic") and Ron Reuben ("Reuben") (collectively, "Appellants") appeal from the decision of the United States Court of Federal Claims ("the Claims Court") granting summary judgment in favor of the government. *Authentic Apparel Grp., LLC v. United States*, 146 Fed. Cl. 147 (2019) ("*Summary Judgment Decision*"). Appellants also appeal from the Claims Court's decision dismissing Reuben as a co-plaintiff in the litigation. *Authentic Apparel Grp., LLC v. United States*, 123 Fed. Cl. 92 (2015) ("*Dismissal Decision*"). For the reasons stated below, we affirm.

## BACKGROUND

In August 2010, the Department of the Army ("Army") granted Authentic a nonexclusive license to manufacture and sell clothing bearing the Army's trademarks in exchange for royalties. The license agreement required the Army's advance written approval of any products and marketing materials bearing the Army's trademarks. The license agreement stated:

> Prior to any sale or distribution, [Authentic], at its expense, shall submit to [the Army] all items including, but not limited to, products, packaging, labeling, point of sale materials, trade show displays, sales materials and advertising (subject to Section 14.3) bearing the PROPERTY and/or CREATIONS . . . for [the Army]'s advance written approval, in [the Army]'s ***sole and absolute discretion***, at all stages listed below.

J.A. 224 § 5.1 (emphasis added).[1]  The license agreement also included exculpatory clauses that exempted the Army from liability for exercising its discretion to deny approval of Authentic's products and marketing materials:

> [Authentic] shall not have any rights against [the Army] for damages or other remedies by reason of [the Army]'s failure or refusal to grant any approval referred to in this Section 5.

J.A. 225 § 5.1.8.

> [Authentic] shall not have any rights against [the Army] for damages or any other remedy by reason of [the Army]'s failure or refusal to grant approval of any advertising.

J.A. 239 § 14.3.

Between 2011 and 2014, Authentic submitted nearly 500 requests for approval to the Army through The Beanstalk Group LLC ("Beanstalk"), a company that the Army has engaged to manage its trademark licenses.  The Army disapproved only 41 of those submissions.  During that time, Beanstalk sent several formal notices of material breach to Authentic for what it stated were failures to timely submit royalty reports and pay royalties.  Authentic eventually paid its outstanding royalties through 2013, but on November 24, 2014, Authentic's counsel informed Beanstalk that Authentic had no intention of paying outstanding royalties for 2014, and instead intended to sue the government for damages.

On January 6, 2015, Authentic and Reuben filed a complaint in the Claims Court against the United States for

---

[1]    The license agreement provides definitions for the terms "PROPERTY" and "CREATION," but for our purposes it is sufficient to assume that those terms refer to the Army's trademarks.

breach of contract.  The primary allegations of breach were based on what Appellants stated as the Army's denial of the right to exploit the goodwill associated with the Army's trademarks, refusal to permit Authentic to advertise its contribution to certain Army recreation programs, delay of approval for a financing agreement for a footwear line, and denial of approval for advertising featuring the actor Dwayne "The Rock" Johnson.  On August 26, 2015, the Claims Court dismissed Reuben as a plaintiff from the case for lack of standing.  *Dismissal Decision*, 123 Fed. Cl. at 96–97.  Authentic subsequently amended its complaint to include an allegation that the Army breached the implied duty of good faith and fair dealing by not approving the sale of certain garments.

On November 27, 2019, the Claims Court granted the government's motions for summary judgment and denied Authentic's cross motions.  The Claims Court determined that, in view of the express exculpatory clauses in the license agreement, Authentic could not recover damages from the government based on the Army's exercise of its discretion regarding the approval or disapproval of products and marketing materials.  *See Summary Judgment Decision*, 146 Fed. Cl. at 156–57.  The Claims Court then proceeded to separately examine and reject each allegation in Authentic's amended complaint, finding that the Army's conduct was in line with its obligations under the license agreement and was not unreasonable.  *Id.* at 157–77.  The Claims Court entered judgment in favor of the government.  Authentic appealed, and we have jurisdiction under 28 U.S.C. § 1295(a)(3).

DISCUSSION

I

We first address Appellants' challenge to the dismissal of Reuben for lack of standing.  The Claims Court's subject matter jurisdiction is a question of law.  *Bosco v. United States*, 931 F.2d 879, 882 (Fed. Cir. 1991) (citing *Phillips v.*

*GSA*, 924 F.2d 1577, 1579–80 (Fed. Cir. 1991)).  We therefore review de novo the Claims Court's determination regarding standing.  *Id.* (citing *Chevron U.S.A., Inc. v. United States*, 923 F.2d 830, 833 (Fed. Cir. 1991)).  But "[w]e review any factual findings, including those underlying the standing analysis . . . , for clear error."  *Starr Int'l Co. v. United States*, 856 F.3d 953, 963 (Fed. Cir. 2017) (citing *Norman v. United States*, 429 F.3d 1081, 1087 (Fed. Cir. 2005)).

Standing to sue the United States on a contract claim is limited to those in privity of contract with the government.  *See P. Gas & Elec. Co. v. United States*, 838 F.3d 1341, 1350 (Fed. Cir. 2016) ("*PG&E*").  In rare situations, a third party can have standing to sue the United States upon a showing that he or she is an intended third-party beneficiary of a contract with the government.  *See Flexfab, L.L.C. v. United States*, 424 F.3d 1254, 1263 (Fed. Cir. 2005).  However, even with regard to contracts between private parties, third-party beneficiary status is considered an "exceptional privilege" that is "an exception to the general principle, which proceeds on the legal and natural presumption that a contract is only intended for the benefit of those who made it."  *German All. Ins. Co. v. Home Water Supply Co.*, 226 U.S. 220, 230 (1912).  Thus, it is well settled that "the requirements to demonstrate third-party beneficiary status are 'stringent.'"  *PG&E*, 838 F.3d at 1361 (quoting *Anderson v. United States*, 344 F.3d 1343, 1352 (2003)).  "In order to prove third party beneficiary status, a party must demonstrate that the contract not only reflects the express or implied intention to benefit the party, but that it reflects an intention to benefit the party directly."  *Glass v. United States*, 258 F.3d 1349, 1354 (Fed. Cir. 2001).  "[A]t a minimum there must be a particular, identifiable benefit that was clearly intended to flow to the third party."  *PG&E*, 838 F.3d at 1361.

Here, it is undisputed that Reuben was not in privity of contract with the government because he was not a party

to the license agreement.  Thus, the only question is whether Reuben has established that the license agreement contained a particular benefit that was clearly intended to flow directly to him.  We conclude that Reuben has not made such a showing.

Importantly, the license agreement at issue in this case does not mention Reuben's name (with the exception of the signature block on the amendments), and certainly does not clearly identify Reuben as an intended beneficiary.  Moreover, the license agreement indicates in plain language that "all rights and duties herein are personal to [Authentic]," *i.e.*, not to anyone else.  *See* J.A. 234 § 12.1.  Reuben, as Authentic's chairman, undoubtedly stood to benefit indirectly from the license agreement.  In that regard, however, he is hardly different from any other company owner who indirectly benefits from the business transactions of his or her company.  Under the law, such indirect benefit is not sufficient to establish third-party beneficiary status for purposes of standing.  *See Castle v. United States*, 301 F.3d 1328, 1338 (Fed. Cir. 2002) ("[I]n order to make a shareholder a third[-]party beneficiary, the contract must express the intent of the promissor to benefit the shareholder personally, *independently of his or her status as a shareholder*." (quoting *Glass*, 258 F.3d at 1354)); *see also S. Cal. Fed. Sav. & Loan Ass'n v. United States*, 422 F.3d 1319, 1331 (Fed. Cir. 2005) ("[A] corporation is generally considered to be a separate legal entity from its shareholder[.]").

In attempting to support his claim to third-party beneficiary status, Reuben asks us to rewind the clock to 2007, three years before the 2010 license agreement between Authentic and the Army.  In 2007, Reuben was the chairman of a different company called All American Apparel, Inc. ("All American") when that company entered into a different license agreement for use of the Army's trademarks.  Reuben alleges that the Army breached that 2007 license agreement, that the Army's alleged breach caused All

American to go bankrupt, and that the Army later decided to give Authentic—a different company—a more favorable royalty rate in the 2010 license to benefit Reuben "as compensation for the damages caused by the Army's breach of the [2007 license with All American]." Appellants' Br. 58.

Distilled to its essence, Reuben's claim to third-party beneficiary status rests entirely on his affiliation with two different companies that entered into two different license agreements with the Army. Reuben attempts to bridge the divide between those companies by implying that Authentic is in some way a successor to All American. For example, Reuben characterizes the two licenses—which, again, the Army made with two separate companies—as the "First License" and the "Second License." *See, e.g.*, Appellants' Br. 2–3. Similarly, Reuben emphasizes the fact that Authentic's license in 2010 had a lower royalty rate than All American's license in 2007, and refers to the lower rate as a "reduction." *See id.* at 15. But even accepting every one of Reuben's allegations as true, he has at most demonstrated that his personal circumstances may have contributed to the Army's reasons for agreeing to certain terms in the 2010 license agreement with Authentic. There is no escaping the reality, however, that it was not Reuben himself who received the direct benefit of paying a lower royalty rate. The direct benefit from the favorable contract terms flowed to Authentic, not to Reuben personally.

In concluding his argument in this court, Reuben's counsel posed a rhetorical question: "If the 40% [royalty rate] reduction wasn't to help [Reuben], who was it there to help?" Oral Arg. at 13:40–13:43, http://oralarguments. cafc.uscourts.gov/default.aspx?fl=20-1412_01062021.mp3. That rhetorical question is easily answered by stating the obvious: the royalty rate in the 2010 license agreement between Authentic and the Army was intended to benefit the parties that entered into that license agreement—*i.e.*, Authentic and the Army. The Claims Court therefore correctly held that Reuben did not have third-party

beneficiary status under the 2010 license agreement, and the court properly dismissed Reuben for lack of standing.

## II

We turn to Authentic's challenge to the Claims Court's grant of summary judgment. "We review 'the summary judgment of the Court of Federal Claims, as well as its interpretation and application of the governing law, de novo.'" *Hartman v. United States*, 694 F.3d 96, 101 (Fed. Cir. 2012) (quoting *Gump v. United States*, 86 F.3d 1126, 1127 (Fed. Cir. 1996)). Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. R. Ct. Fed. Cl. 56(a).

## A

We begin with the language of the contract itself. "Contract interpretation is a question of law generally amenable to summary judgment." *Premier Office Complex of Parma, LLC v. United States*, 916 F.3d 1006, 1011 (Fed. Cir. 2019) (quoting *Varilease Tech. Grp., Inc. v. United States*, 289 F.3d 795, 798 (Fed. Cir. 2002)). In this case, the express language of the license agreement is dispositive.

The license agreement stated in no uncertain terms that the Army had "sole and absolute discretion" regarding approval of Authentic's proposed products and marketing materials. J.A. 224 § 5.1. In addition to that provision, the license agreement also included exculpatory clauses expressly stating that Authentic would have no right to bring a cause of action against the Army based on the Army's exercise of that discretion. J.A. 225 § 5.1.8; J.A. 239 § 14.3. The Claims Court relied on a Supreme Court decision upholding the validity and enforceability of such an exculpatory clause with respect to the government's liability for delay damages. *See Wood v. United States*, 258 U.S. 120 (1922); *see also Wells Bros. Co. v. United States*, 254 U.S. 83 (1920). The Supreme Court has made clear that courts

should enforce "a plain and unrestricted covenant on the part of the contractor, comprehensive as words can make it, that it will not make any claim against the government." *Wells Bros.*, 254 U.S. at 87.

At bottom, Authentic agreed to give the Army broad approval discretion, and, similar to the parties in *Wells Bros.* and *Wood*, Authentic agreed to bear the risk that the Army would exercise that discretion to Authentic's detriment, at least so long as the government did not act arbitrarily or in bad faith, a matter which we discuss below. Authentic's allegation that the detriment has indeed come to pass is simply not a reason to uproot the parties' bargain.

B

Authentic's primary argument for allowing its lawsuit to proceed despite the exculpatory clauses is based on general principles of trademark licensing law. Authentic argues that even if the Army has broad approval discretion under the license agreement, that discretion cannot be so broad as to allow the Army to refuse to permit the use of its trademarks "for trademark purposes." *See* Appellants' Br. 43–48. Authentic contends that the Army's interpretation of the breadth of its discretion, as adopted by the Claims Court, allowed the Army to restrict Authentic's use of the marks to solely "decorative" purposes, which Authentic suggests are not "trademark purposes." *See id.* In so doing, Authentic argues, the Army separated the trademarks from their associated goodwill, and thus unlawfully turned the license agreement into a license "in gross," *see id.*, which it asserts invalidates the trademarks.

We first note, in addressing this argument, that we are dealing with contract interpretation in this appeal, not evaluating the validity of trademarks. Whether the Army's licensing practices impair the validity of its trademarks is its own business, not a matter for Authentic to complain about, and certainly does not nullify express clauses in the parties' licensing agreement.

But grappling with Authentic's argument, we are not persuaded that the Army's conduct was at odds with principles of trademark law. Authentic's argument appears to rest on a premise that trademark licenses carry with them special considerations that make them inherently distinguishable from other types of contracts, such as the construction contracts at issue in *Wells Bros.* and *Wood*. *See, e.g.*, Appellants' Reply Br. 9 (attempting to distinguish *Wells Bros.* and *Wood* on the basis that the contracts in those cases "had as their 'object' the construction of something"). But we see no indication that the Supreme Court's reasoning in *Wells Bros.* and *Wood* depended on the underlying subject matter of the contracts at issue, nor do we discern any reason why it would have. Rather, the Court relied on the principle that contract terms "cannot be treated as meaningless and futile and read out of the contract." *Wells Bros.*, 254 U.S. at 87. Contracting parties, including parties who contract with the government, are generally held to the terms for which they bargained. *See id.* That principle is equally applicable in this case.

Even assuming, however, that there are special considerations for trademark licenses, those considerations as they have been argued by Authentic do not persuade us that the exculpatory clauses are not controlling in this case. Authentic's argument is based on rights that Authentic did not have, namely, an alleged "right to identify [the Army] as the source/sponsor of the licensed goods." *See* Appellants' Br. 45. Under the law, because Authentic was itself the source of the licensed goods, Authentic could not have had the right to mislead consumers to believe that the Army was the "source." *See, e.g.*, *Visa, U.S.A., Inc. v. Birmingham Tr. Nat'l Bank*, 696 F.2d 1371, 1375 (Fed. Cir. 1982) ("A key objective of the law of trademarks is protection of the consumer against being misled or confused as to the source of the goods or services he acquires."). And, under the express terms of the license agreement, Authentic agreed that it could not represent to the public that its

products were made by the Army, or "supported, endorsed or sponsored" by the Army.  J.A. 218 § 2.4; *see also id.* (requiring Authentic to produce all goods under its own name).

Authentic presents the term "for trademark purposes" as if it is a term of art in the field of trademark licensing law with a well-established meaning.[2]  But, although Authentic cites the statutory definition of the term "trademark" in the Lanham Act, *see* 15 U.S.C. § 1127, Authentic cites no legal authority that purports to define—or even use—the term "for trademark purposes" in the context of a trademark licensing dispute.  More problematically, Authentic relies on an outdated model of trademark licensing law to push an unduly narrow interpretation of what it means for a licensee's use of a trademark to be "for trademark purposes."

At one time it was accepted law that "a trademark's sole purpose was to identify for consumers the product's physical source or origin."  *See K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 313 (1988) (Brennan, J., concurring-in-part) (citing *Macmahan Pharmacal Co. v. Denver Chem. Mfg. Co.*, 113 F. 468, 475 (8th Cir. 1901)).  "'Under this early "source theory" of protection, trademark licensing was viewed as philosophically impossible . . . .'"  *Id.* (quoting 1 J. McCarthy, Trademarks and Unfair Competition 826 (2d ed. 1984)).  However, in the middle of the twentieth century, "a trend develop[ed] approving of trademark licensing—so long as the licensor controlled the quality of the licensee's products—on the theory that a trademark might also serve the function of identifying product quality for consumers."  *Id.* at 314 (citing 1 McCarthy, Trademarks and Unfair Competition, at 827–29); *see also* 3 McCarthy on Trademarks and Unfair Competition § 18.40 (5th ed.

---

[2]    The term "for trademark purposes" appears more than 20 times in Authentic's opening brief.

2020) ("The quality theory permits a trademark owner to license the mark and allow licensees to buy supplies from anyone, provided the licensor maintains quality control over products reaching consumers under the mark.").

Under current prevailing law, the Army was required to maintain quality control over the products associated with its trademarks. Authentic has not alleged, or come forth with evidence, that such quality control measures were lacking in this case. Authentic concedes that the approval provisions in the license agreement allowed the Army to fulfill its duty to ensure quality control and thus avoid a "naked license" of the trademarks. *See* Appellants' Br. 44–45. And, as Authentic's entire complaint is based on allegations that the Army was overly strict in the approval process, it cannot be disputed that the Army fulfilled that duty. Thus, there was no problem of naked licensing in this case. *See Dawn Donut Co. v. Hart's Food Stores, Inc.*, 267 F.2d 358, 367 (2d Cir. 1959) (explaining "naked licensing" as "the grant of licenses without the retention of control" (citing *E.I. DuPont de Nemours & Co. v. Celanese Corp. of Am.*, 167 F.2d 484, 489 (C.C.P.A. 1948))).

In view of the clear shift in the law toward allowing trademark licenses, we do not agree with Authentic that a "decorative" use of a trademark is necessarily divorced from the goodwill associated with the trademark such that it cannot be considered a licensed use "for trademark purposes." We recognize, of course, that a purely decorative design may not qualify for trademark protection in the first place. *See, e.g.*, Trademark Manual of Examining Procedure § 1202.03 (Oct. 2018) ("Subject matter that is merely a decorative feature does not identify and distinguish the applicant's goods and, thus, does not function as a trademark . . . . This matter should be refused registration because it is merely ornamentation and, therefore, does not function as a trademark, as required by §§1, 2, and 45 of the Trademark Act, 15 U.S.C. §§1051, 1052, and 1127."). But, again, this appeal does not involve a challenge to the

validity of the Army's trademarks, but rather a question of what limitations the Army may place on the use by a licensee of trademarks that the Army already owns.

Throughout its briefing, Authentic repeatedly implies that the only way it could have capitalized on the goodwill associated with the Army's marks would have been by giving consumers the impression that they were getting property from the Army. *See, e.g.*, Appellants' Br. 47; Appellants' Reply Br. 16. But "[a] trademark need not be the name of the manufacturer of the goods and the public need not know the name of the owner of the mark." *In re Polar Music Int'l AB*, 714 F.2d 1567, 1571 (Fed. Cir. 1983) (citing *Coco-Cola Co. v. Koke Co. of Am.*, 254 U.S. 143, 146 (1920)); *see also Fin. Matters, Inc. v. Pepsico, Inc.*, 806 F. Supp. 480, 481 n.2 (S.D.N.Y. 1992) ("It is well-established that the public need not know the name of the trademark owner for the[re] to be goodwill in a mark, nor does the name of the owner have to appear on the product itself."). It has become accepted law that "[a] use of a trademark properly may display only the licensed mark and the name of the licensee." *See Gen. Motors Corp. v. Gibson Chemical & Oil Corp.*, 786 F.2d 105, 110 (2d Cir. 1986) (citing 1 McCarthy, Trademarks and Unfair Competition, at 832); *see also* 3 McCarthy on Trademarks and Unfair Competition § 18.45.

Authentic acknowledges that the Army's marks are "famous." *See* Appellants' Br. 46. And it is not disputed that the Army approved the majority of Authentic's product proposals, including uses of the phrase "U.S. Army" as well as the Army logo. Even if the approved uses could be characterized as "decorative," which is not entirely clear, Authentic fails to explain why that should categorically remove them from the class of uses that the Army should be allowed to license. On the contrary, the Army's approvals seem to have been in the spirit of the law and the license agreement because they allowed Authentic to benefit from the goodwill associated with the Army's marks while still

14          AUTHENTIC APPAREL GROUP, LLC v. UNITED STATES

requiring that Authentic sell its own products under its own name.  To the extent Authentic asserts that there was a lack of consumer interest in the products that the Army approved, *see, e.g.*, Oral Arg. at 10:25–10:30 (attempting to distinguish between "merchandizing" versus "garment design"), that was a business problem for Authentic, not a legal problem that the Army was required to resolve.

For the foregoing reasons, Authentic has not persuaded us that the Army's exercise of its broad approval discretion under the license agreement is inconsistent with principles of trademark law.  We therefore see no justification to disregard the exculpatory clauses in the license agreement.

C

In addition to its trademark arguments, Authentic also attempts to distinguish *Wells Bros.* and *Wood* on the basis that the exculpatory clauses in those cases merely assigned risk that the parties had previously contemplated and did not apply to all of the government's obligations.  *See* Appellants' Reply Br. 9, 11.  But here too, the exculpatory clauses in the license agreement pertain to behavior that the parties contemplated and addressed in the license agreement, namely, the Army's discretion to disapprove Authentic's products and marketing materials.  *See* J.A. 225 § 5.1.8; J.A. 239 § 14.3.

We recognize that the potential for abuse may have existed in this case because the license agreement required Authentic to pay minimum royalties but it did not expressly require the Army to approve any of Authentic's proposed products.  *See* Oral Arg. at 3:34–3:49 (Authentic's contention that it was "not reasonable for the Army to have insisted that [Authentic] pay guaranteed minim[um] royalties while refusing to approve any merchantable products from which to generate revenues from which to pay those [royalties]").  And we are skeptical of the government's position that the Army could have been in compliance with its contractual obligations even if it had issued arbitrary

rejections and acted in bad faith.  *See id.* at 15:21–17:50. But none of those hypothetical factual scenarios played out in this case.  The Army approved more than 90% of Authentic's proposals.  And, as the Claims Court found that Authentic's evidence could not even support allegations that the Amy acted unreasonably, *see Summary Judgment Decision*, 146 Fed. Cl. at 152, we certainly do not see a genuine dispute of material fact about whether the Army acted arbitrarily or in bad faith such that its conduct might fall outside of the exculpatory clauses.  To be sure, the government indeed does have an obligation of good faith and fair dealing in its contracting, *see Dobyns v. United States*, 915 F.3d 733, 739 (Fed. Cir. 2019) ("Every contract, including one with the federal government, imposes upon each party an implied duty of good faith and fair dealing in its performance and enforcement." (citing *Metcalf Constr. Co. v. United States*, 742 F.3d 984, 990 (Fed. Cir. 2014))), but Authentic has not identified evidence that could establish that the government violated its obligation here.

For the foregoing reasons, Authentic's arguments do not persuade us that there is a legal or factual reason to deviate from a plain reading of the exculpatory clauses in the license agreement.  We therefore hold that the Claims Court correctly granted summary judgment in favor of the government.

## CONCLUSION

We have considered Authentic's remaining arguments but we find them unpersuasive.  Accordingly, the decisions of the Claims Court are affirmed.

## **AFFIRMED**