# United States Court of Appeals for the Federal Circuit

---

**PACIFIC GAS AND ELECTRIC COMPANY, SOUTHERN CALIFORNIA EDISON COMPANY, SAN DIEGO GAS & ELECTRIC COMPANY, PEOPLE OF THE STATE OF CALIFORNIA EX REL. EDMUND G. BROWN JR., ATTORNEY GENERAL OF THE STATE OF CALIFORNIA, CALIFORNIA DEPARTMENT OF WATER RESOURCES, BY AND THROUGH ITS CALIFORNIA ENERGY RESOURCES SCHEDULING DIVISION,**
*Plaintiffs-Appellants*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

---

2015-5082

---

Appeal from the United States Court of Federal Claims in Nos. 1:07-cv-00157-SGB, 1:07-cv-00167-SGB, 1:07-cv-00184-SGB, Judge Susan G. Braden.

---

October 3, 2016

---

CARTER GLASGOW PHILLIPS, Sidley Austin LLP, Washington, DC, argued for plaintiffs-appellants. Also repre-

sented by TOBIAS SAMUEL LOSS-EATON, QUIN M. SORENSON; MARIE L. FIALA, San Francisco, CA; STAN BERMAN, Seattle, WA.

JANE IRENE RYAN, Steptoe & Johnson, LLP, Washington, DC for plaintiff-appellant Southern California Edison Company. Also represented by HEATHER HORNE.

MARK FOGELMAN, Friedman & Springwater, LLP, San Francisco, CA, for plaintiff-appellant San Diego Gas & Electric Company. Also represented by RUTH STONER MUZZIN.

GARY ALEXANDER, Office of the Attorney General, California Department of Justice, San Francisco, CA, for plaintiffs-appellants People of the State of California Ex Rel. Edmund G. Brown, Jr., Attorney General of the State of California, California Department of Water Resources.

JAMES R. SWEET, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee. Also represented by BENJAMIN C. MIZER, ROBERT E. KIRSCHMAN, JR., MARTIN F. HOCKEY, JR.; MARK WILLIAM PENNAK, Appellate Staff, Civil Division, United States Department of Justice, Washington, DC.

CANDACE J. MOREY, California Public Utilities Commission, San Francisco, CA, for amicus curiae Public Utilities Commission of the State of California. Also represented by AROCLES AGUILAR.

JAMES BRADFORD RAMSAY, National Association of Regulatory Utility Commissioners, Washington, DC, for amicus curiae National Association of Regulatory Utility Commissioners.

———————————

Before NEWMAN, DYK, and WALLACH, *Circuit Judges.*

Opinion for the court filed by *Circuit Judge* DYK.

Dissenting opinion filed by *Circuit Judge* NEWMAN.

DYK, *Circuit Judge.*

Pacific Gas and Electric Company, Southern California Edison Company, San Diego Gas & Electric Company, and the state of California (collectively, "appellants"), brought suit against the United States claiming that two federal government agencies selling electricity (the Western Area Power Administration and the Bonneville Power Administration) (collectively, "the government") overcharged appellants for electricity.

The United States Court of Federal Claims (the "Claims Court") dismissed their breach of contract action for lack of standing. Appellants appeal. We conclude that appellants lack privity of contract or any other relationship with the government that would confer standing. Because appellants lack standing, we affirm. This does not, however, suggest that appellants were without a remedy for the alleged overcharges against the parties with whom they are in contractual privity—two California electricity exchanges—or that the exchanges lacked a breach of contract remedy for overcharges against the government agencies that sold them electric power.

BACKGROUND

I

Under the Tucker Act, the Claims Court has jurisdiction over contract cases in which the government is a party. *See* 28 U.S.C. § 1491(a)(1); *Gonzales & Gonzales Bonds & Ins. Agency v. Dept. of Homeland Sec.*, 490 F.3d 940, 943 (Fed. Cir. 2007). Normally, a contract between the plaintiff and the United States is required to establish

standing to sue the government on a contract claim. *S. Cal. Fed. Sav. & Loan Ass'n v. United States*, 422 F.3d 1319, 1328 (Fed. Cir. 2005) ("A plaintiff must be in privity with the United States to have standing to sue the sovereign on a contract claim.").

This case involves the purchase and sale of electricity in the California market. Appellants contend that they were overcharged for electricity during the period from October 2, 2000, to June 20, 2001 ("the 2000–2001 period"), and seek to recover the overcharges from the United States based on sales by two federal government agencies—the Western Area Power Administration ("WAPA") and the Bonneville Power Administration ("BPA"). Two exchanges were involved in these transactions—the California Power Exchange ("Cal-PX") and the California Independent System Operator ("Cal-ISO"). These exchanges were responsible for acquiring and distributing electricity between producers and consumers in California and setting prices for the electricity. The basic question is whether purchase and sale contracts existed between the exchanges, on the one hand, and the appellants and defendant government agencies, on the other, or whether the contracts were between the appellants and the government agencies—the consumers and producers of electric power. If the contracts were between the exchanges and market participants individually, appellants' remedy is against the exchanges. If the contracts were between the consumers and producers of electricity, appellants' remedy is against the government producers.

Appellants contend that a contract existed between two groups—one group consisting of all consumers of electricity (including appellants) and the other group consisting of all producers of electricity (including the government agencies) in California. Under appellants' theory, appellants and all other power consumers are in privity of contract with all producers in the California

markets, including the government sellers. The government, on the other hand, contends that the contracts were only between the middleman entities that facilitated and operated the California electricity markets—Cal-PX and Cal-ISO—and the consumers and producers individually. Under the government's theory, appellants are in privity of contract with Cal-PX and Cal-ISO, and the government is also in privity of contract with Cal-PX and Cal-ISO, but appellants are not in privity with the government.

## II

On the face of it, the only contracts here were between the exchanges—Cal-PX and Cal-ISO—and individual market participants (the consumers and producers). Both of these exchanges entered into individual contracts with each of the consumers and producers of electricity. The basis for appellants' alternative theory requires some understanding of the background.

In the late 1990s, California restructured and deregulated its energy market. In 1996, California established two non-profit organizations to acquire and distribute electricity and to otherwise organize and supervise all of the wholesale energy transactions in the state. One non-profit, Cal-PX, was designed to facilitate and conduct all wholesale electric power transactions for the state of California. Cal-PX's responsibilities included, *inter alia*, collecting supply and demand bids from sellers and buyers of wholesale electricity respectively, processing those bids to develop aggregate supply and demand curves from the total pool of bids received, setting a market clearing price based on the intersection point of the aggregate supply and demand curves, preparing financial settlements by issuing statements to all market participants, establishing a calendar for payment, and settling payment individually with each market participant by debiting or crediting its Cal-PX account. Cal-PX was also

responsible for determining the proper distribution of funds in the event of an overpayment, collecting the overpaid funds from the overpaid participants, and remitting those funds to the market participants who overpaid.

The other exchange, Cal-ISO, was established to assume operational control over all of California's electric transmission facilities and ensure supply and demand on a real-time basis. Cal-ISO was responsible for, *inter alia*, operating the transmission grid, ensuring the necessary supply of energy, maintaining nondiscriminatory access to the grid, purchasing and providing ancillary services, and maintaining a real-time spot market for electricity to balance out any last-minute disparities between supply and demand in the Cal-PX market. In this regard, Cal-ISO operated as a back-up to the primary Cal-PX market for wholesale energy.

Cal-PX and Cal-ISO filed tariffs with the Federal Energy Regulatory Commission ("FERC"), the independent federal agency with regulatory authority over the interstate sale of all wholesale electricity and transmission service. The tariffs ("Cal-PX Tariff" and "Cal-ISO Tariff," respectively) established the terms and conditions of service and rates for the California markets. The Cal-PX Tariff and the Cal-ISO Tariff both contained clauses known in the industry as *Memphis* clauses, which preserved the ability of consumers and producers in the California markets to exercise their rights under the Federal Power Act ("FPA") to petition FERC for a change in the terms or rates of the tariffs.

All consumers and producers of wholesale energy in the California markets entered into individual agreements with Cal-PX and Cal-ISO, known as participation agreements. Every Cal-PX participation agreement incorporated the Cal-PX Tariff, and every Cal-ISO participation agreement incorporated the Cal-ISO Tariff. None

of the consumers and producers of wholesale energy purported to contract directly with one another; rather, all participants in the California markets executed separate participation agreements with Cal-PX and Cal-ISO only. Indeed, individual contracts between consumers and producers were not feasible since electricity is fungible, and purchases and sales of electricity could not be traced to particular consumers and producers in the California markets.

Appellants entered into participation agreements with Cal-PX and Cal-ISO shortly after California deregulated the market to purchase electricity. WAPA and BPA, the defendant federal power-producing administrations, also executed participation agreements with Cal-PX and Cal-ISO. No agreements were executed between appellants and the federal agencies. In 1999, the government agencies began selling energy into the California markets through Cal-PX and Cal-ISO, along with many other sellers. Appellants were among the many consumers of that energy.

To transact energy in California, potential consumers and producers submitted bids to Cal-PX to buy or sell wholesale electric power. Based on all of the bids received, Cal-PX compiled supply and demand curves to calculate a "market price" that it then applied uniformly to all transactions within a given market. Consumers paid Cal-PX, which organized and disbursed the funds to sellers in proportion to the amount of energy each supplied. Consumers never paid producers directly. Cal-ISO operated in a similar fashion. In this way, Cal-PX and Cal-ISO served as exchanges or centralized clearinghouses, acquiring electric power from producers and distributing it to consumers and otherwise facilitating wholesale energy transactions for market participants pursuant to the conditions and constraints imposed by the governing tariffs.

As a result of the method of pricing in the California energy market, appellants contend that they and each of the many other consumers were overcharged for purchases during the 2000–2001 period, allegedly as a result of improper pricing mechanisms. Cal-PX set prices on an hourly basis to satisfy short-term demand for "spot markets." While Cal-PX also set prices over a larger period for long-term or "forward contract" markets, most purchases and sales were in the spot markets. *Pac. Gas & Elec. Co. v. United States*, 122 Fed. Cl. 315, 322–23 (2015). Appellants and other consumers became subject to unstable spot market purchases. "Sellers quickly learned that the California spot markets could be manipulated by withholding power . . . to create scarcity and then demanding extremely high prices when scarcity was probable." *Pub. Utilities Comm'n of Cal. v. FERC,* 462 F.3d 1027, 1039 (9th Cir. 2006). By May 2000, the price of wholesale power in the California markets doubled. Blackouts rolled across the state as it descended into an energy crisis.

By August 2000, appellants and all other consumers were charged prices three to four times greater than the market rates of less than a year earlier. Appellants believed the rates established by the exchanges were unjust and unreasonable. Appellants sought relief by filing a complaint with FERC, which, with respect to non-government entities, has the authority to set an effective date, determine whether rates charged after that date are unjust and unreasonable, and order refunds for rates charged after that date if it determines that they are unjust and unreasonable. Here, FERC set an effective date of October 2, 2000, determined that rates charged after that date were unjust and unreasonable, and ordered that refunds be paid by all sellers in the California market.

A series of appeals to the Ninth Circuit ensued. As is

relevant here, the Ninth Circuit held that FERC lacked jurisdiction to order the government to pay refunds, *Bonneville Power Admin. v. FERC*, 422 F.3d 908, 926 (9th Cir. 2005), a determination that is not now contested. This was so because government agencies are not subject to FERC jurisdiction, as § 201(f) of the Federal Power Act makes clear: "No provision of this subchapter shall apply to . . . the United States . . . or any agency, authority, or instrumentality [thereof]." 16 U.S.C. § 824(f); *see also Bonneville*, 422 F.3d at 920. Although FERC lacked the authority to order the government to pay refunds, the Ninth Circuit upheld FERC's ability to find the rates charged by all sellers, including the government agencies, to be unjust and unreasonable. *See City of Redding v. FERC*, 693 F.3d 828, 841 (9th Cir. 2012) (explaining that to the extent that FERC revised or reset the market rate for the 2000–2001 period, this was within FERC's authority, as it "necessarily involved reevaluating the price previously charged by all market participants because the market clearing price was the same for all of them").

Since FERC lacked jurisdiction to order refunds by the government,[1] appellants brought this breach of contract action in the Claims Court, alleging that the government producers had breached agreements between the consumers and producers by overcharging appellants and all other consumers and by failing to pay a refund for unjust and unreasonable prices charged during the 2000–

---

[1] Later, in August 2005, Congress passed legislation to amend FERC's § 206 refund authority, extending it to cover certain federal entities if they voluntarily make short-term sales of electricity of more than 8 million MWh per year. *See* Energy Policy Act of 2005, Pub. L. No. 109-58, § 1286, 119 Stat. 594, 981; *see also Bonneville*, 422 F.3d at 921 n.10. This legislation is inapplicable here.

2001 period.

After a trial, Judge Smith found in favor of appellants. *See Pac. Gas & Elec. Co. v. United States*, 105 Fed. Cl. 420, 440 (2012). Judge Smith held that "the facts at trial showed that the Agencies contracted with and owe contract obligations to [appellants]." *Id.* at 432. In his view, Cal-PX and Cal-ISO "were pass-through entities or clearinghouses" only, and he therefore concluded that "the payment obligations were between the buyer [consumer] and seller [producer]." *Id.* at 432–33. Judge Smith further held that the government had breached its contract with appellants by failing to pay refunds. *See id.* at 439–40.

Before the damages-phase proceedings began, Judge Smith retired from the bench. His successor, Judge Braden, vacated Judge Smith's opinions and dismissed the case for, *inter alia*, lack of standing. *Pacific Gas*, 122 Fed. Cl. at 329–335, 343. Judge Braden held that while appellants were in privity of contract with the exchanges, they lacked privity with the government. *See id.* at 331. Judge Braden further held that appellants failed to demonstrate the existence of an agency relationship between the government and the exchanges, *see id.* at 334–35, and failed to demonstrate that appellants were third-party beneficiaries of the government's contracts with the exchanges, *see id.* at 332–34.[2] This appeal followed. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).

---

[2] Judge Braden additionally held that the Claims Court lacked subject matter jurisdiction, *see id.* at 336–37, and that, assuming appellants have standing, appellants' breach of contract claim failed on the merits, *see id.* at 341–43. In light of our resolution based on standing, we need not address these other issues.

DISCUSSION

I

Appellants first contend that Judge Braden violated the law of the case doctrine by vacating Judge Smith's rulings.

According to appellants, the law of the case doctrine "counsels particular caution when one judge is asked—or, as here, decides *sua sponte*—to reconsider her predecessor's decisions." Br. of Appellants at 32–33. Appellants assert that this case should be remanded because Judge Braden's decision to reconsider Judge Smith's decisions constituted an abuse of discretion.

But the dispositive issue addressed on reconsideration here—standing—is a pure issue of law, which we review *de novo*. *See S. Cal. Fed. Sav. & Loan Ass'n*, 422 F.3d 1319, 1328 (Fed. Cir. 2005).[3] And the question of standing here depends on contract interpretation, which also is a question of law that we review *de novo*. *See, e.g., S. Nuclear Operating Co. v. United States*, 637 F.3d 1297, 1301 (Fed. Cir. 2011). Indeed, appellants agree that "Judge Braden's specific errors in interpreting the contracts and the Ninth Circuit's decisions were purely legal, and are therefore subject to plenary review." Br. of Appellants at 62 n.11. Judge Smith's contract interpretation was also legal in character. Judge Smith made no rele-

---

[3]    *See also DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 340 (2006) (Every court has an "obligation to assure [itself] of litigants' standing under Article III." (internal quotation marks and citation omitted)); *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 515 (4th Cir. 2003) ("Article III standing in particular . . . represents perhaps the most important of all jurisdictional requirements." (internal quotation marks and citation omitted)).

vant findings of fact with respect to interpretation of the contract provisions at issue.[4]  *See, e.g.*, *Thatcher v. Kohl's Dept. Stores, Inc.*, 397 F.3d 1370, 1373 (Fed. Cir. 2005). Accordingly, even if appellants could demonstrate that Judge Braden erred in reconsidering Judge Smith's interlocutory decisions, they have suffered no prejudice, since our review of both decisions of the Claims Court is *de novo*.  We thus proceed to consider the issue of stand-

---

[4]    Appellants contend that "evidence of trade practice and custom plays an important role in contract interpretation," *Metric Constructors, Inc. v. Nat'l Aeronautics & Space Admin.*, 169 F.3d 747, 752 (Fed. Cir. 1999), and therefore that Judge Smith's consideration of testimony regarding the "industry's established understanding of the tariff language," in particular with respect to the *Memphis* clauses, is owed deference.  Reply Br. of Appellants at 6.  Appellants rely heavily on testimony of their former employees and former employees of Cal-PX as to the significance of various tariff provisions, but appellants point to no testimony that establishes "a contract term having an accepted industry meaning different from its ordinary meaning" of the sort required for evidence of trade practice to be relevant in contract interpretation. *See, e.g.*, *TEG-Paradigm Envtl., Inc. v. United States*, 465 F.3d 1329, 1338 (Fed. Cir. 2006) (internal quotation marks and citation omitted).

The extrinsic evidence presented in this case simply established that the *Memphis* clauses were understood in the industry as meaning what they said: market participants retained authority to petition FERC for a determination of whether the prices charged were just and reasonable, a finding that is not relevant to the issue before us, as discussed below.  The issue of contract interpretation here remains a pure question of law which we review *de novo*.

ing. *S. Cal. Fed. Sav. & Loan Ass'n*, 422 F.3d at 1328.

## II

As noted above, typically "[t]o have standing to sue the sovereign on a contract claim, a plaintiff must be in privity of contract with the United States," *Anderson v. United States*, 344 F.3d 1343, 1351 (Fed. Cir. 2003), and "[s]tanding is a threshold jurisdictional issue that implicates Article III of the Constitution." *S. Cal. Fed. Sav. & Loan Ass'n*, 422 F.3d at 1328. "Not only is privity a fundamental requirement of contract law, but it takes on even greater significance in cases such as this, because the 'government consents to be sued only by those with whom it has privity of contract.'" *Id.* (quoting *Erickson Air Crane Co. of Wash. v. United States*, 731 F.2d 810, 813 (Fed. Cir. 1984)). "The effect of finding privity of contract between a party and the United States is to find a waiver of sovereign immunity." *Cienega Gardens v. United States*, 194 F.3d 1231, 1239 (Fed. Cir. 1998). We do not lightly presume that the government's actions give rise to contractual obligations when the government is not a named party to the contract in dispute. *See United States v. Algoma Lumber Co.*, 305 U.S. 415, 421 (1939).

Limited exceptions to the privity requirement have been recognized when a "party standing outside of privity by contractual obligation stands in the shoes of a party within privity," such as when a party can demonstrate that it was an intended third-party beneficiary under the contract, *see, e.g.*, *First Hartford Corp. Pension Plan & Tr. v. United States*, 194 F.3d 1279, 1289 (Fed. Cir. 1999), or when a party can demonstrate that a prime contractor acted as purchasing agent on behalf of the government in contracting with a subcontractor. *See Nat'l Leased Hous. Ass'n v. United States*, 105 F.3d 1423, 1435–36 (Fed. Cir. 1997); *United States v. Johnson Controls, Inc.*, 713 F.2d 1541, 1551 (Fed. Cir. 1983).

### III

We first address the issue of contractual privity, addressing later in this opinion appellants' alternative theories of agency and third-party beneficiary. The government argues that the only contracts for the purchase and sale of electricity here were between each market participant and the exchanges. We agree. There is no question that each of the many buyers and sellers entered into contracts with the exchanges. Each individual participant in the California markets executed a contract with one or both exchanges incorporating the relevant tariff. Each contract described the parties as being the individual participant and the exchange only. For example, BPA's contract with Cal-PX explicitly provided that "THIS AGREEMENT . . . is entered into, by and between: (1) BONNEVILLE POWER ADMINISTRATION . . . and (2) THE CALIFORNIA POWER EXCHANGE CORPORATION." J.A. 424. No parties other than the individual participant and the relevant exchange were listed on any contract.

While the Uniform Commercial Code ("UCC") does not apply directly to government contracts, *see, e.g.*, *GAF Corp. v. United States*, 932 F.2d 947, 951 (Fed. Cir. 1991), the UCC "provides useful guidance in applying general contract principles," *Hughes Commc'ns Galaxy, Inc. v. United States*, 271 F.3d 1060, 1066 (Fed. Cir. 2001); *see also Diversified Energy, Inc. v. Tenn. Valley Auth.*, 339 F.3d 437, 446 n.9 (6th Cir. 2003); *Tech. Assistance Int'l, Inc. v. United States*, 150 F.3d 1369, 1372 (Fed. Cir. 1998). The parties appear to agree that the provision of electricity involves the sale of a good which would invoke the UCC. *See, e.g.*, Br. of Appellants at 41 ("Here . . . the Agencies sold the power itself—which is personal property under [41 U.S.C.] § 7102(a)(4) . . . ."). Indeed, we would lack jurisdiction under the Contract Disputes Act if the contracts were interpreted as involving the provision of

services rather than goods. *See* 41 U.S.C. § 7102(a). Under the Supreme Court's decision in *United States v. Eurodif, S.A.*, the fact that electricity is fungible suggests that the exchanges bought from and sold electricity to market participants, rather than merely facilitating a transfer between producers and consumers. *See* 555 U.S. 305, 319–20 (2009) (explaining that a transaction involving a fungible product is more likely to be viewed as the sale of a good as opposed to the sale of a service).[5]

On the face of the agreements, the exchanges were performing a typical middleman function with respect to transactions in goods as described in commentary on the UCC. *See* Lary Lawrence, 2 *Lawrence's Anderson on the Uniform Commercial Code*, §§ 2-103:18, 103:44 (3d ed. 2012). Under typical middleman contracts, "courts will treat as a buyer [and seller] a middleman who contracts for the sale of goods to be delivered to a third person." *Lawrence*, at § 2-103:18; *see also id.* at §§ 2-103:19, 103:44–45. Though the title to the electricity passes directly from producers to consumers, the UCC makes quite clear that this is not inconsistent with a middleman contract for purchase and sale. "A middleman making a contract . . . is a 'seller' for the purpose of Article 2, even though the middleman does not have, [nor] will ever have, title to the goods, as title is to pass directly from the

---

[5]  Some cases suggest that the provision of water or electricity involves the provision of services, *see, e.g.*, *Mattoon v. City of Pittsfield*, 775 N.E. 2d 770, 783 (Mass. App. Ct. 2002) (water); *Sterling Power Partners, L.P. v. Niagara Mohawk Power Corp.*, 657 N.Y.S.2d 407, 407 (App. Div. 1997) (electricity), but often such suggestion arises only because courts have concluded that the provision of water or electricity involves both a service and a good. *E.g.*, *Mattoon*, 775 N.E. 2d at 783.

supplier to the customer of the middleman." *Id.* at § 2-103:45.

The incorporated tariffs confirm this reading. On their face the tariffs contemplate that the exchanges will acquire energy from the producers and transfer it to the consumers. *See, e.g.*, S.A. 15 ("[Cal-PX] shall . . . allocate to PX Participants costs incurred by the PX under this Tariff and the ISO Tariff in . . . *buying or selling Energy* . . . ." (emphasis added)); S.A. 119 ("The PX shall settle with each PX Participant for Energy traded . . . . Each PX Seller shall be credited with an amount equal to its scheduled *sales* of Energy . . . . Each PX Buyer shall be debited by the PX with an amount equal to its scheduled *purchase* of Energy . . . ." (emphasis added)); S.A. 337 (Cal-ISO "shall *purchase* Ancillary Services capacity." (emphasis added)); S.A. 513 ("Unstructured Imbalance Energy attributable to each [market participant] for each Settlement Period in the relevant Zone *shall be deemed to be sold or purchased*, as the case may be, *by the ISO* . . . ." (emphasis added)); S.A. 519; S.A. 339; S.A. 381.

The tariffs do not just contemplate that the exchanges will provide and distribute electric power; rather, they also contemplate that the exchanges will set the price of the electricity itself. *See, e.g.*, J.A. 456. The tariffs were also clear that in the event of an overcharge by the producers (the allegation here), the producers were obligated to make payment to the exchange, not the consumers directly. *See, e.g.*, S.A. 59 ("Each PX Participant acknowledges that it incurs separate financial obligations *to the PX* in respect to its PX Core Market Transactions . . . . All PX Participants shall honor their obligations to pay all of the amounts *owed to the PX in a timely manner*." (emphasis added)); S.A. 60 ("If for any reason a PX Creditor receives on any Payment Date more than the amount to which it is entitled under the PX Tariff, . . . [it] shall forthwith pay the excess amount *into a PX Account speci-*

*fied by the PX.*" (emphasis added)); S.A. 528–29 ("If for any reason . . . a [market participant] receives an over-payment . . . [it] shall forthwith pay the overpayment into an ISO Account specified by the ISO."); S.A. 529 ("The ISO shall be responsible for payment to those entitled to the sum which has been overpaid.").

This arrangement is confirmed by other provisions of the tariffs concerning settlement obligations. With respect to payment, for example, the Cal-PX Tariff explains that "*[t]he PX* shall settle with each PX Participant for Energy traded in the PX Markets in the manner set forth in Schedule 6." J.A. 466 (emphasis added). Neither tariff contemplates direct payment from consumers to producers, or vice versa; indeed, such payment would be impossible because specific buyers were never matched with and could not be identified by specific sellers. Instead, Cal-PX allocated payment and energy in proportion to the bids submitted by each participant. Cal-PX was responsible for calculating, collecting, and disbursing all payments for energy on the market. "The PX shall (1) calculate the prices at which trades in Energy are transacted in the PX Markets, (2) settle trades in Energy between PX Participants, (3) . . . allocate to PX Participants costs incurred by the PX under this Tariff . . . [and] (4) prepare and distribute to PX Participants invoices . . . ." J.A. 456. The same was true with respect to Cal-ISO.

Appellants argue that these participant/exchange contracts nonetheless should not be interpreted as contracts for the purchase and sale of goods because of two types of provisions appearing in the tariffs. First, there is a provision in the Cal-PX Tariff which purports to limit the exchange's role in the energy transactions: Cal-PX "will not be, and shall not be deemed to be, a counterparty to

any trade transacted through the PX Markets." J.A. 457.[6] The meaning of this provision in the Cal-PX Tariff is unclear. "Counterparty" is defined as "the party with whom one is consummating a contract." *Counterparty*, *Black's Law Dictionary* (10th ed. 2014). But it is undisputed here that Cal-PX contracted directly with each market participant. In saying that the exchange is not a counterparty to any "trade," the above provision appears only to provide that Cal-PX did not take title to any of the energy transferred. As described, this is consistent with Cal-PX's role as a middleman. *See Lawrence*, at § 2-103:44.

In any event, the counterparty provision cannot be read to bar the existence of a purchase and sale contract between the exchanges and each individual market participant, because such a provision would directly conflict with all of the provisions discussed above which clearly contemplate that Cal-PX, as middleman, contracted for the purchase and sale of electricity. When there is an apparent conflict between contractual provisions, we "enforce the clause[s] relatively more important or principal to the contract." 11 *Williston on Contracts* § 32:15 (4th ed. 2016). Thus, for example, in *Oleson v. Bergwell*, 283 N.W. 770 (Minn. 1939), the court held that a contract containing many provisions contemplating the outright sale of stock should be construed to provide for a sale even though the agreement stated that it "shall be deemed and considered by the parties as an *option* to purchase." *Id.* at

---

[6]    As discussed below in section VIII, there are also provisions that are claimed to create an agency relationship. These provisions do not prevent the existence of purchase and sale contracts between the exchanges and individual market participants, but rather form the basis of appellants' argument regarding agency.

772 (emphasis added). Because "the principal purpose of this contract was to effectuate a sale," *id.* at 773, the court treated the contract as a sales contract. *See id.; see also Nicholas Acoustics & Specialty Co. v. H & M Constr. Co.*, 695 F.2d 839, 843 (5th Cir. 1983) (enforcing the "dominant" of two conflicting contract provisions by considering the "tenor" of the agreement as a whole).

Here, the lone provision cited by appellants purporting to limit Cal-PX's role is vastly outweighed in both number and significance by the other provisions of the tariff, which clearly establish Cal-PX's role as a middleman purchasing and selling electricity. Accordingly, we do not read the counterparty provision as disclaiming the existence of a middleman contract for the purchase and sale of electricity. There is, moreover, no similar provision in the Cal-ISO Tariff.

Second, appellants rely on provisions that appear to contemplate that suits may be brought by one participant against another. Significantly, as described below, these provisions do not suggest that the groups of all consumers and producers are collectively liable to each other, as appellants contend. In any case, these provisions hardly suggest that suits may not be brought by participants against the exchanges or that there are no purchase and sale contracts between the market participants and the exchanges. Indeed, as described below, the tariffs make clear that the exchanges had remedies against defaulting participants.[7]

---

[7] There are also provisions in the tariffs which limit the exchanges' liability to acts of negligence or intentional wrongdoing. *See* S.A. 30 (Cal-PX "shall not be liable in damages to any PX Participant for any losses, damages, claims, liability, costs or expenses (including legal ex-

We conclude that the contracts between the exchanges and the participants are middleman contracts for the purchase and sale of electricity.

## IV

Appellants nonetheless contend that the above events should be construed as involving contracts directly between the groups of purchasers and consumers of electricity in the California markets. Appellants concede that there are no individual agreements between consumers and producers. The only documents that purport to be contractual agreements are the agreements between the exchanges and the consumers and producers of electricity. As discussed, those agreements on their face are agreements between a particular consumer or producer and each exchange. Appellants' theory is instead that the agreement of each of the consumers and producers to abide by the tariff creates an agreement between all consumers, on the one hand, and all producers, on the other. No written document purports to be such an agreement, and the various provisions on which appellants rely cannot be read to create such an agreement.

Appellants originally argued that the *Memphis* clauses in the Cal-PX and Cal-ISO tariffs (incorporated into each individual contract) somehow established a contractual obligation by the government agencies to pay refunds in accordance with the FERC order to appellants. Appel-

_____

penses) arising from the performance or non-performance of its obligations under this Tariff, except to the extent that they result from negligence or intentional wrongdoing on the part of [Cal-PX].”); S.A. 550 (same for Cal-ISO). We need not decide what limitations these provisions might impose on the ability of the consumers to recover from the exchanges.

lants have now abandoned this argument, and wisely so. The *Memphis* clauses simply provide that "[n]othing contained in this Tariff or any service or participation agreement shall be construed as affecting, in any way, the ability of any PX Participant receiving service under this Tariff to exercise its rights under Section 206 of the FPA and pursuant to FERC's rules and regulations promulgated thereunder." J.A. 471; *see also* J.A. 1040 (Cal-ISO Tariff). While the *Memphis* clauses preserve the market participants' rights to petition FERC to limit unjust and unreasonable rates pursuant to the FPA, such rights do not extend from one market participant to another, and cannot be construed as the source of any contractual obligation between market participants.

Instead of relying on the *Memphis* clauses, appellants now primarily rely on the overpayment provisions. *See* S.A. 60 ("The PX shall be responsible for ascertaining the identity of those PX Participants entitled to receive amounts overpaid to another PX Participant and for disbursing those funds to the persons entitled to them promptly after they are returned in accordance with Section 4.3.3 above."); S.A. 529 ("The ISO shall be responsible for payment to those entitled to the sum which has been overpaid."). But such provisions provide that a payment obligation exists only between the market participants and the exchanges, not between consumers and producers directly. As discussed above, if a market participant learned that it had received excess payment, the tariffs make clear that it was obligated to return those funds "into a PX Account specified by the PX." J.A. 501; *see also* J.A. 1015–16 (Cal-ISO Tariff). In other words, excesses owed were to be paid back to Cal-PX or Cal-ISO, not to the parties directly. Thus, it was the exchanges that were "responsible for ascertaining the identity of those PX Participants entitled to receive amounts overpaid" and for "disbursing those funds to the persons

entitled to them," J.A. 501, not the other market partici-
pants, *see also* J.A. 1015–16 (Cal-ISO Tariff).  Cal-PX and
Cal-ISO were solely responsible for collecting from the
overpaid participant and remitting proportionately to all
owed participants.  Contrary to appellants' characteriza-
tion, this arrangement creates no obligations directly
between buyers and sellers.

Nor do the provisions of the tariffs concerning possible
legal action between market participants suffice to create
a contract.  At most there are provisions in the Cal-ISO
Tariff which contemplate suit between market partici-
pants.  *See* S.A. 529 ("Each ISO Creditor shall give notice
to the ISO before instituting any action or proceedings in
any court against an ISO Debtor to enforce payments due
to it."); S.A. 530 ("The ISO shall, on request, certify in
writing the amounts owed by an ISO Debtor that remain
unpaid and the ISO creditors to whom such amounts are
owed and shall provide [a certificate which] . . . may be
used as prima facie evidence of the amount due by an ISO
Debtor to ISO Creditors in any legal proceedings.").  The
Cal-PX Tariff contains no such provision, but provides
that Cal-PX will identify a defaulting market participant
to other affected participants.  *See* S.A. 64 (Cal-PX "will
identify the defaulting Participant to all other affected PX
Participants by the most expeditious means available.").
These provisions do not purport to create a right of action
by one market participant against another, nor do they
create any payment obligation between market partici-
pants.  These provisions do not support appellants' theory
of collective liability, and fall well short of creating obliga-
tions between consumers and producers.

Finally, the tariffs explicitly grant the exchanges
remedies against a defaulting participant.  "If the PX
Participant fails to pay any sum or to perform any other
obligation *to the PX . . .* when due, then *the PX may, in its
sole discretion* and without further notice to the default-

ing PX Participant or regard to formalities of any kind, *pursue all remedies* under [this] Section," J.A. 504–05 (emphasis added), including the right to "recoup, set-off and apply any amount to which any defaulting PX Participant is entitled towards satisfaction of any of that PX Participant's debts," S.A. 68. *See also* J.A. 501–03; J.A. 1013–14 (Cal-ISO Tariff). The tariffs provide that Cal-PX "and PX Participants . . . may be parties to a dispute [in arbitration]" arising under the contracts, arbitration being the specified dispute resolution mechanism. S.A. 141; *see also* S.A. 536 (Cal-ISO). Accordingly, these provisions concerning possible legal action between consumers and producers do not create a contract between groups of consumers and producers.

Quite apart from the lack of any written document reflecting an agreement between buyers and sellers, the alleged agreements cannot satisfy the requirement of reasonable certainty applicable to the essential terms of all contracts. *See* Restatement (Second) of Contracts § 131 (Am. Law. Inst. 1981) (a contract within the Statute of Frauds must "state[] with reasonable certainty the essential terms of the unperformed promises in the contract," and the "parties must be reasonably identified"); 10 *Williston on Contracts*, § 29:8 (a contract "must contain the essential or material terms . . . including the parties, the subject matter, a description of the property or goods affected, and in at least some jurisdictions, the price or consideration and an indication that the parties have mutually assented to the terms of the agreement"); *see also* U.C.C. § 2-201 (Am. Law Inst. & Unif. Law Comm'n 1977) ("[A] contract for the sale of goods . . . is not enforceable . . . unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought."). Although under the UCC an omitted term does not necessarily render a sales contract

unenforceable, *see* § 2-204(3), "it is still necessary for the person claiming the benefit of the contract to establish that, in fact, there was a contract and to establish its terms," 2 *Lawrence*, § 2-201:15. There is no basis here for determining the groups that are supposed parties to the contracts at any particular time or the particular obligations that each group owes to the other. Nor is there any basis for determining the duration or other material terms of the alleged agreement(s). The certainty required for the existence of a contract is simply lacking.

V

Appellants additionally argue by analogy to the law of stock exchanges that "participants in an exchange may assert claims against one another based on provisions of the governing contract." Br. of Appellants at 45. The two cases upon which appellants rely, *Muh v. Newburger, Loeb & Co.*, 540 F.2d 970 (9th Cir. 1976), and *Coenen v. R.W. Pressprich & Co.*, 453 F.2d 1209 (2d Cir. 1972), do not support such a broad proposition. In *Muh*, the Ninth Circuit held that the arbitration provision of a stock exchange's constitution was binding in a lawsuit brought by one member of the exchange against another member for breach of a separate contract. *Muh*, 540 F.2d at 973. There was no dispute in *Muh* that the members were in privity of contract with respect to the contract involved in the action for breach. *See id.* at 971–72. Similarly, in *Coenen* the Second Circuit held that an arbitration provision of a stock exchange's constitution applied to a lawsuit brought by one member against another for refusal to allow the transfer of certain shares of stock under a separate agreement. *Coenen*, 453 F.2d at 1210–11. There was also no dispute in *Coenen* that the members were in privity with respect to the separate agreement. *See id.* Thus in neither case was the constitution of the stock exchange itself the source of privity between the parties in suit. Rather the courts simply read into the explicit

separate contracts between exchange members a clause of the exchanges' governing constitutions.

It is well-settled that the constitution of a stock exchange does not automatically confer privity upon all those who transact in the exchange. In the analogous context of suits brought by purchasers of stock against insider traders, courts have recognized that there is no direct privity of contract in the traditional sense between buyers and sellers on the exchange. *See, e.g.*, William H. Painter, *Inside Information: Growing Pains for the Development of Federal Corporation Law Under Rule 10b-5*, 65 Colum. L. Rev. 1361, 1372–73 (1965); *see also Cochran v. Channing Corp.*, 211 F. Supp. 239, 245 (S.D.N.Y. 1962); *Joseph v. Farnsworth Radio & Television Corp.*, 99 F. Supp. 701, 706 (S.D.N.Y. 1951), *aff'd*, 198 F.2d 883 (2d Cir. 1952). It was for this very reason that the implied private right of action under section 10(b) of the Securities Exchange Act was fashioned to avoid any requirement of traditional privity to bring suit. *See* Veronica M. Dougherty, *A [Dis]semblance of Privity: Criticizing the Contemporaneous Trader Requirement in Insider Trading*, 24 Del. J. of Corp. L. 83, 89–90 (1999). Because there is no private right of action upon which appellants can rely here, appellants' argument by analogy to the law of stock exchanges is unavailing.

Appellants also rely on one court decision holding a contracting party liable as a result of the incorporation of a tariff into a separate contract. *See Alliant Energy v. Neb. Pub. Power Dist.*, 347 F.3d 1046 (8th Cir. 2003). *Alliant Energy* does not lend support to the notion that buyers and sellers in an energy exchange are in contractual privity. In that case, there was a contract for the provision of services between parties to an energy exchange. *See Alliant Energy, Inc. v. Neb. Pub. Power Dist.*, No. 00-2139 ADM/FLN, 2001 WL 1640132, at *1 (D. Minn. Oct. 18, 2001). A tariff governed the terms of those

services. *See id.* at *1–2. The court held that a FERC finding that the rates charged for those services were discriminatory required a refund under the contract. *See Alliant Energy*, 347 F.3d at 1049–50 ("When a contract provides that its terms are subject to a regulatory body, *all parties to that contract* are bound by the actions of the regulatory body." (emphasis added)). The court in *Alliant Energy* did not find privity in the absence of an explicit contract.

Nor is this a situation in which appellants are entitled to step into the shoes of the exchanges and sue the government directly. Indeed, appellants make no such argument. It is well-settled that a party cannot step into the shoes of another party to pursue a contract claim absent explicit assignment of the claim or assignment by operation of law under equitable subrogation. *See, e.g.*, *Lumbermens Mut. Cas. Co. v. United States*, 654 F.3d 1305, 1312–13 (Fed. Cir. 2011). There has been no suggestion here that the contracts between the exchanges and market participants were assigned or that appellants are subrogated to the rights of the Cal-PX and Cal-ISO. Nor could there be. We have held that equitable subrogation is a narrow exception to the traditional privity requirement, and we have only found equitable subrogation in the surety context. *See Ins. Co. of the W. v. United States*, 243 F.3d 1367, 1370 (Fed. Cir. 2001); *Admiralty Constr., Inc. v. Dalton*, 156 F.3d 1217, 1222 (Fed. Cir. 1998).

## VI

Significantly, both FERC and the Ninth Circuit understood that the contracts between individual market participants and the exchanges were middleman contracts for the purchase and sale of electricity, and that no contractual privity existed between market participants. In a related proceeding, FERC explained that "[i]n these

circumstances, we believe it is reasonable to construe both the bidding participants and the PX to be engaged in sales of electric energy. Accordingly, we conclude that the bidding PX participants will be engaged in sales of electric energy at wholesale *to the PX*, *who will then resell that energy* to wholesale and retail customer participants." *S. Cal. Edison Co.*, 80 FERC 61,262, 61,946 (1997) (emphasis added). FERC described that Cal-PX "will be the intermediary that contracts with the entities that sell into the PX as well as with the wholesale and retail customers that purchase *from the PX*." *Id.* (emphasis added). Similarly, in a related proceeding, FERC held that "*there are no sales contracts between sellers and buyers of electricity sold into the PX*." *S. Cal. Edison Co.*, 80 FERC at 61,945 (1997) (emphasis added). FERC further explained, "[i]n this proceeding, we are faced with a new market institution in which *sellers and buyers of electric energy will not contract directly with one another*, as has been traditionally done in the industry, *but instead will contract with the PX*." *Id.* (emphasis added). Indeed, FERC understood that, as a consequence of this lack of privity between buyers and sellers, any refunds due as a result of a FERC refund order would be paid to the exchanges, not directly to the underpaid market participants. *See San Diego Gas & Elec. v. Sellers of Energy & Ancillary Servs.*, 102 FERC 61,317, 62,079–80 (2003). These interpretations were echoed by the Ninth Circuit. *See S. Cal. Edison Co. v. Lynch*, 307 F.3d 794, 800 (9th Cir. 2002) (holding that market participant SoCal Edison "is in privity with the California Power Exchange Corporation, not with [other market participants]").

## VII

Finally, appellants argue that it would be unfair to deny appellants a remedy for the government's overcharges and to allow the government to retain the windfall profits. Appellants assert that, without a finding of

privity between consumers and producers here, "the [government] [is] wholly immunized from public or private accountability." Br. of Appellants at 71. But the absence of an agreement between consumers and producers hardly suggests the lack of a remedy. It may well be that the producers of electric power would have been liable to the exchanges for any overcharges, and that the exchanges in turn would have been liable to the appellant consumers. The procedural mechanisms for such suits clearly exist under the tariffs.

Although interpleader, which is ordinarily the remedy for a party in appellants' position, is not available here because the government is a party, *see Gonzales*, 490 F.3d at 943, appellants could have sought recovery from the exchanges, with which they are in direct privity of contract, as is clearly contemplated by the arbitration dispute resolution procedures established by the tariffs. *See* S.A. 141, 535. The exchanges in turn could have sought contribution from the government under the same arbitration procedures, which may have provided for a mechanism similar to traditional interpleader.[8] Appellants failed to pursue this course, however, and instead would have us manufacture privity among all buyers and sellers in the California markets where there is none. This we decline to do.

## VIII

Alternatively, appellants contend that they have standing under an agency theory. Appellants argue that,

---

[8]     We have no occasion to decide here whether the arbitration remedy would now be foreclosed by the passage of time, or by waiver. Nor do we decide whether the exchanges could have recovered in arbitration against the federal government defendant agencies.

even if the only contracts are between the exchanges and market participants, the exchanges acted as agents for all consumers and producers in the California markets in every energy transaction. Under certain circumstances, an entity not in direct contractual privity with another party may nevertheless sue if it contracted with a third entity, and an agency relationship is demonstrated between that third entity and the defendant. *See Nat'l Leased Hous. Ass'n v. United States*, 105 F.3d 1423, 1435–36 (Fed. Cir. 1997); *United States v. Johnson Controls, Inc.*, 713 F.2d 1541, 1551 (Fed. Cir. 1983).

"The relationship of principal and agent is created by a manifestation of assent by both parties." 12 *Williston on Contracts* § 35:1 (4th ed. 2016). "The consent of both principal and agent is necessary to create an agency." *Id.* "[T]he principal must intend for the agent to act for the principal, and the agent must intend to accept the authority and act on it; and the intention of the parties must find expression either in words or other conduct between them." *Id.* As a "general rule, the party asserting the agency has the burden of proving both the existence of the relationship and the authority of the agent." 12 *Williston on Contracts* at § 35:2; *see also* Restatement (Third) of Agency § 1.02(d) (Am. Law Inst. 2006) ("The party asserting that a relationship of agency exists generally has the burden in litigation of establishing its existence.").

Here, appellants rely on two provisions of the tariffs that they argue created an agency relationship between all consumers on the one hand and all producers on the other, with the exchanges acting as agent for both groups. Appellants cite the Cal-PX Tariff, which provides that "the PX acts as an Agent for the PX Participants and its inclusion in a Payment Flow does not infer that it is a principal in the financial transaction," J.A. 1846, and the Cal-ISO Tariff, which provides that "[i]n contracting for

Ancillary Services and Imbalance Energy the ISO will not act as principal but as agent for and on behalf of the relevant [market participants]," J.A. 753.[9]

Even if those provisions are read to address an agency relationship for the purchase and sale of electricity, it is well established that parties' statements in a contract are not dispositive as to the existence of an agency relationship. "Whether a relationship is characterized as agency in an agreement between parties or in the context of industry or popular usage is not controlling." Restatement (Third) of Agency § 1.02; s*ee also, e.g., Matter of Carolin Paxson Advert., Inc.,* 938 F.2d 595, 598 (5th Cir. 1991). The key to the existence of an agency relationship is not any characterization in a contract,[10] but rather is set forth in section 1.01 of the Restatement of Agency. An agency relationship "arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents to so act." Restatement (Third) of

---

[9]    The Cal-ISO Tariff also provides that "[Cal-]ISO may bring proceedings against any [market participant] on behalf of those [market participants] who have indicated to the ISO their willingness for the ISO first so to act, for the recovery of any amounts due by that [market participant]." S.A. 530.

[10]    Appellants additionally rely on statements made by a Vice President for one of the government agencies suggesting that the exchanges acted as an "agent." *See* Br. of Appellants at 60, J.A. 3726–27. But the fact that various individuals participating in the process may have characterized the relationship as an agency similarly does not establish an agency relationship as a matter of law. Restatement (Third) of Agency § 1.02.

Agency § 1.01. Agency thus requires "control" by the principal. *See Hollingsworth v. Perry*, 133 S. Ct. 2652, 2666 (2013) ("An essential element of agency is the principal's right to control the agent's actions." (internal quotation marks and citations omitted)). "[T]he principal's right to control the agent . . . differentiates . . . agency relationships from nonagency relationships." Restatement (Third) of Agency § 1.01 cmt. e. Here the requisite control is clearly deficient.

"A relationship is not one of agency within the common-law definition unless the agent consents to act on behalf of the principal, *and the principal has the right throughout the duration of the relationship to control the agent's acts*." *Id.* at § 1.01 cmt. c (emphasis added). It is for this reason that a mere "middleman" is not typically an agent. *Id.* at cmt. h. The control necessary to demonstrate an agency relationship requires that "a principal [have] the right to give interim instructions or directions to the agent once their relationship is established." *Id.* at cmt. f; *see also Clackamas Gastroenterology Assocs., P.C. v. Wells*, 538 U.S. 440, 448 (2003).

Judge Braden recognized that, notwithstanding the provisions purporting to create an agency relationship, no agency relationship exists because, *inter alia*, the government lacked sufficient control over the exchanges. *See Pacific Gas*, 122 Fed. Cl. at 334. We agree.[11]

---

[11] Appellants contend that the government conceded that an agency relationship exists with respect to Cal-ISO. While the government's position regarding Cal-ISO is confusing and appears to be self-contradictory, *compare* Br. of Appellees at 37–38 ("Even though the ISO (as opposed to the PX) was an agent of the scheduling coordinators, the Buyers do not have standing to pursue claims

Here, the alleged principals—the buyers and sellers—lack any meaningful control over the exchanges. The tariffs provide that the exchanges have plenary control over, *inter alia*, setting prices; charging, collecting, and remitting payments; ensuring the transfer of the appropriate amount of energy from each transaction; and collecting and remitting money in the event of overpayment. Indeed it is the exchanges that are explicitly empowered with the ability to issue instructions, detailing, *inter alia*, settlement and payment obligations to the buyers and sellers, not the other way around. Appellants point to no provision of the tariffs that affords the government meaningful control over the exchanges. Without such evidence of the alleged principal's control over the alleged agent, there can be no agency relationship.[12]

---

upon the ISO contracts on their own."), *with id.* at 40 ("the ISO cannot be an agent"), the absence of an agency relationship is clear for both exchanges. We have an independent obligation to address standing regardless of any position the government has taken in the case. *See, e.g.*, *Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 255 (1994); *see also Gonzalez v. Thaler*, 132 S. Ct. 641, 648 (2012).

[12] *See, e.g.*, *Transamerica Leasing, Inc. v. La Republica de Venezuela*, 200 F.3d 843, 848–50 (D.C. Cir. 2000) (a subsidiary corporation was not the agent of its parent because the parent did not exercise "control over the subsidiary in a manner more direct than by voting a majority of the stock in the subsidiary or making appointments to the subsidiary's Board of Directors"); *Johnston v. Warren Cty. Fair Ass'n*, 110 F.3d 36, 38 (8th Cir. 1997) (holding that the lack of evidence of the alleged principal's control over the alleged agent "precludes the finding of an agency relationship"); *Matter of Carolin*

Nothing in this court's decisions contemplating an agency exception to the privity requirement suggest that control is not required for agency. Indeed, those cases, which have been limited to the prime-contractor/subcontractor context, hold that a subcontractor cannot sue the government directly unless, *inter alia*, there is an explicit provision in the contract which provides that the government will be "directly liable to the vendors for the purchase price." *Nat'l Leased Housing*, 105 F.3d at 1436 (quoting *Johnson Controls,* 713 F.2d at 1551). Even assuming that this situation was comparable to the prime-contractor/subcontractor context, it is undisputed that there is no such provision in the contracts here.

We conclude that the agreements cannot be interpreted as creating agency relationships.

IX

Finally, appellants contend that they have standing to sue the government because they are third-party beneficiaries of the government's contracts with Cal-PX and Cal-ISO. One of the "[l]imited exceptions" to the general privity requirement for standing is when the plaintiff can demonstrate that it was an intended third-party beneficiary under the contract. *S. Cal. Fed. Sav. & Loan Ass'n*, 422 F.3d at 1328; *First Hartford*, 194 F.3d at 1289.

"Third party beneficiary status is an 'exceptional privilege,'" *Glass v. United States*, 258 F.3d 1349, 1354 (Fed. Cir. 2001) (quoting *German All. Ins. Co. v. Home Water Supply Co.*, 226 U.S. 220, 230 (1912)), and the require-

---

*Paxson*, 938 F.2d at 598–99 (finding no agency relationship for lack of sufficient control because the alleged principals had "no control over the method by which" the alleged agent performed its duties).

ments to demonstrate third-party beneficiary status are "stringent," *Anderson*, 344 F.3d at 1352. "Before a stranger can avail himself of the exceptional privilege of suing for a breach of an agreement to which he is not a party, he must, at least, show that it was intended for his direct benefit." *German All.,* 226 U.S. at 230. To demonstrate third-party beneficiary status, therefore, a party must prove that "the contract not only reflects the express or implied intention to benefit the party, but that it reflects an intention to benefit the party directly." *Flexfab, L.L.C. v. United States*, 424 F.3d 1254, 1259 (Fed. Cir. 2005) (quoting *Glass*, 258 F.3d at 1354). Third-party beneficiary status is not established "merely because [a] contract would benefit [a party]." *Fed. Deposit Ins. Corp. v. United States*, 342 F.3d 1313, 1319 (Fed. Cir. 2003).

As the Restatement makes clear, typical third-party beneficiary situations arise when, for example, one party promises another to pay a debt to a third party. In such circumstances, the third party is a third-party beneficiary with standing to sue on the contract. *Restatement (Second) of Contracts* § 302 illus. 1 (Am. Law Inst. 1981). While a third-party beneficiary need not always be named explicitly in the contract, have the "direct right to compensation[,] or the power to enforce that right against the promisor," the contract must demonstrate a clear intent to benefit a third-party beneficiary "personally, independent of his or her status" as a member of a group generally benefited by a contract's performance. *Anderson*, 344 F.3d at 1352 (internal quotation marks and citations omitted); *see also Castle v. United States*, 301 F.3d 1328, 1338 (Fed. Cir. 2002). In other words, at a minimum there must be a particular, identifiable benefit that was clearly intended to flow to the third party.

*Anderson v. United States* is instructive. In *Anderson* we held that two individuals were not third-party beneficiaries of an alleged contract with the government simply

because they were named beneficiaries of a trust which was owed certain contractual obligations from the government. *See* 344 F.3d at 1351–52. We explained that, "[u]nder the contract, every promise the government allegedly failed to keep . . . pertains to the regulatory treatment of [the Trust]. Nothing suggests that the government made any promises expressly intended to benefit [the individuals] personally, independently of their status as beneficiaries of the Trust." *Id.* at 1352. Similarly, in *Glass v. United States* we held that shareholders of a corporation were not third-party beneficiaries of a contract between the corporation and the government because the contract manifested no intent to benefit the shareholders individually, independent of their status as shareholders. 258 F.3d at 1354–55.

Here appellants contend that they are third-party beneficiaries based on the overpayment provisions of the tariffs. But, as discussed, the overpayment provisions create obligations and remedies for Cal-PX and Cal-ISO, not the market participants. Contrary to appellants' assertion that these provisions gave appellants "an explicit contractual right to a refund by sellers of any overpayments [appellants] made when purchasing electricity," Br. of Appellants at 58, the very text quoted by appellants reveals that the overpayment procedures hold Cal-PX and Cal-ISO solely responsible for collecting and disbursing overpayments. "*The PX shall be responsible* for ascertaining the identity of those PX Participants entitled to receive amounts overpaid to another PX Participant *and for disbursing those funds* to the persons entitled to them promptly." J.A. 501; *see also* J.A. 1016 (Cal-ISO Tariff). There is no specific, identifiable benefit that flows directly from producer to consumer under the tariffs.

The only opinion appellants cite in which we have recognized third-party beneficiary standing is *H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1576 (Fed. Cir.

1984).  In *H.F. Allen*, the plaintiffs were farmers in the State of Washington who were members of water-user associations.  *See H.F. Allen Orchards v. United States*, 4 Cl. Ct. 601, 603 (1984).  Those associations contracted with the federal government regarding a federal water project.  *See id.*  In 1943, a federal district court entered a consent decree setting forth the allotment of water from the federal project to the water-user associations.  *Id.*  The plaintiff farmers later brought suit against the federal government for an alleged breach of the consent decree. *H.F. Allen Orchards*, 749 F.2d at 1572.  The Claims Court held that plaintiffs lacked standing to sue the government.  *Id.*  On appeal, we disagreed.  *See id.* at 1576.  We explained that the water-user associations "act[ed] as a surrogate for the aggregation of farmers."  *Id.*  The farmers themselves held a "property right in the water to the extent of their beneficial use thereof," and a specific, identifiable benefit flowed from the government to each farmer under the consent decree.  *Id.*  Accordingly, we held that the farmers were the "true parties in interest" to sue under the decree.  *Id.*

Here there is no identifiable benefit flowing from the particular government agencies to the particular appellants.  Appellants were simply some of the many participants on the buy-side of the California wholesale energy market, and it is impossible to trace the transfer of electric power from producers to consumers.  Appellants cannot demonstrate any particular benefit flowing to them from the government agencies, let alone that the exchanges' contracts with the government intended to benefit them specifically, independent of all other market participants.  Accordingly, appellants fail to establish the "stringent" requirements to demonstrate the "exceptional privilege" of third-party beneficiary status.  *Anderson*, 344 F.3d at 1352; *Glass*, 258 F.3d at 1354.  As such, appellants lack third-party beneficiary standing.

## X

Because appellants are not in direct privity of contract with the government, fail to demonstrate an agency relationship, and do not qualify as third-party beneficiaries on the contract, appellants lack standing to sue the government on the contract claims asserted here. Accordingly, we affirm the decision of the Claims Court dismissing appellants' suit for lack of standing.

**AFFIRMED**

COSTS

Costs to the United States.

# United States Court of Appeals
# for the Federal Circuit

---

**PACIFIC GAS AND ELECTRIC COMPANY,
SOUTHERN CALIFORNIA EDISON COMPANY,
SAN DIEGO GAS & ELECTRIC COMPANY,
PEOPLE OF THE STATE OF CALIFORNIA EX REL.
EDMUND G. BROWN JR., ATTORNEY GENERAL
OF THE STATE OF CALIFORNIA, CALIFORNIA
DEPARTMENT OF WATER RESOURCES, BY AND
THROUGH ITS CALIFORNIA ENERGY
RESOURCES SCHEDULING DIVISION,**
*Plaintiffs-Appellants*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

---

2015-5082

---

NEWMAN, *Circuit Judge*, dissenting.

The United States does not dispute that it over-charged the plaintiffs for electric power, and that it is required to repay the overcharge in accordance with the FERC rate schedule and the governing federal statutes. Nonetheless, the United States' position is that it will not comply with this law, for nobody can sue it to enforce the law. We agree that FERC, a federal agency, cannot order a refund of the overages charged by the United States, but that does not insulate the United States from suit by

the overcharged buyers of electric power from the United States. My colleagues on this panel strain to find a remedy, by announcing that maybe these buyers can recover something from the exchanges that brokered the overcharged transactions—but my colleagues hold that there is no other remedy for the government's refusal to comply with the statute that the government admits to have violated.

The first assigned judge of the Court of Federal Claims rejected this position, on proceedings that lasted seven years. However, the successor judge of that court discarded the prior adjudication, and held that the court is helpless to act. The Federal Circuit now agrees. I respectfully dissent.

### *Legal protection of property rights is a cornerstone of our government*

No person shall . . . be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

U.S. CONST. amend. V.

Government is instituted to protect property of every sort; as well that which lies in the various rights of individuals, as that which the term particularly expresses. This being the end of government, that alone is a *just* government, which *impartially* secures to every man, whatever is his *own*.

*The Complete Madison* at 45 (Saul K. Padover ed. 1953), letter to James Monroe, Oct. 15, 1786 (emphasis in original).

Our court is reminded of this high obligation by these watchwords of the Nation's duty to citizens, carved on the

wall of this courthouse, welcoming those who seek justice in suit against the government:

> It is as much the duty of government to render prompt justice against itself, in favor of citizens, as it is to administer the same between private individuals.

President Abraham Lincoln, First Annual Message Before the U.S. Senate and House of Representatives (Dec. 3, 1861); engraved in the Lobby of the Howard T. Markey National Courts Building, 717 Madison Place, NW, Washington, DC 20439.

These obligations are formalized in the Tucker Act and other implementing legislation, and are assigned to this court.

### *The overcharge and the statutory refund obligation are not disputed*

The overcharge is not disputed: the plaintiffs paid money to the federal power agencies at prices set by FERC-regulated auction markets, and the federal sellers of power and others made windfall profits. FERC then required that these profits be refunded, on the basis of just and reasonable market clearing prices. All of the FERC-ordered refunds to the affected purchasers have been paid by the obligated entities, with the exception of the federal agencies the Bonneville Power Administration (BPA) and the Western Area Power Administration (WAPA) (collectively, the Power Administrators).[1]

Both the BPA and the WAPA had agreed, as a condition of participating in the California power market

---

[1] This suit is concerned only with the BPA and WAPA and their power sales in California.

(CalPX and ISO) to accept FERC-regulated tariffs. However, BPA and WAPA have refused to make the designated repayments in accordance with the FERC-ordered retroactive market clearing prices, which, as the Ninth Circuit held, reach the entirety of the market, not just a portion of the market transactions. *City of Redding v. FERC*, 693 F.3d 828, 842 (9th Cir. 2012). My colleagues hold that the courts cannot require such compliance with law. This cannot be, for compliance with law is the judicial role, and federal compliance is assigned to the Court of Federal Claims and the Federal Circuit.

The Power Administrators acknowledge the overcharges, and do not disagree that the statute requires them to refund the overcharges. The overpayment is not disputed by the government. The panel majority provides details, *see* Maj. Op. 8 ("By August 2000, appellants and all other consumers were charged prices three to four times greater than the market rates of less than a year earlier . . . . FERC . . . ordered that refunds be paid by all sellers in the California market.").

The Ninth Circuit upheld FERC's authority to find the rates charged by all sellers, including the federal agencies, to be unjust and unreasonable. *City of Redding*, 693 F.3d at 842 ("[FERC's] July 2001 Order 'reset' the market clearing prices in the CalPX and ISO spot markets during the refund period to just and reasonable levels for the purpose of calculating the amount of refund due [from FERC-regulated entities]. This calculation necessarily involved reevaluating the price previously charged by all market participants because the market clearing price was the same for all of them.").

It is not disputed that the overage charges are able to be determined, and the refunds properly allocated. The charges, overages, refund allocations, and the like have already been litigated, settled, or otherwise disposed of

via FERC's California Refund Proceeding and related litigation, much of which has received judicial review in the Ninth Circuit. *See, in summary,* FEDERAL ENERGY REGULATORY COMMISSION, THE COMMISSION'S RESPONSE TO THE CALIFORNIA ELECTRICITY CRISIS AND TIMELINE FOR DISTRIBUTION OF REFUNDS (*available at* www.ferc.gov/legal/staff-reports/comm-response.pdf); *see also, e.g.,* 102 FERC ¶ 61120 (establishing a mitigated market clearing price ("MMCP")). "Under the MMCP methodology, refunds were to be determined by the difference between the market clearing price, which was the price charged by all electricity suppliers at a given time, and the MMCP calculated for each hour of the Refund Period, subject to certain adjustments." *PUC v. FERC*, 462 F.3d 1027, 1043 (9th Cir. 2006)).

Yet the BPA and the WAPA refuse to make the refunds, stating that neither FERC nor the courts have jurisdiction to force them to meet these obligations. BPA/WAPA Br. at 8 ("FERC has no . . . jurisdiction over [the agencies]."); *Id.* at 18 ("The Court of Federal Claims . . . does not possess jurisdiction."); *Id.* at 58 ("Court of Federal Claims had no jurisdiction."). However, that is incorrect. Jurisdiction is indeed possessed by the Court of Federal Claims and this court.

### *The Constitution and the Tucker Act provide remedy, whether on a theory of contract or taking of property*

My colleagues hold that no court or agency possesses authority to enforce payment of the refunds due from the United States to the Appellants. The court refuses to apply the standard that FERC requires and enforces of private actors in the same position. All power generators and power purchasers affected by the rates that FERC corrected on the California energy markets are bound by this standard. The Tucker Act formalizes the judicial

authority whereby this standard is enforced against the federal suppliers of power. The Tucker Act provides jurisdiction to render judgment upon any claim against the United States "founded either on the Constitution, or any Act of Congress or any regulation of an executive department, or any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1).

### (a) The contract claim

My colleagues hold that since there was an "exchange" acting as broker between the federal power sellers and the state power purchasers, the purchasers can sue only the exchange on the federal overcharges. My colleagues hold that only the broker "middle-man" is in privity with the government. This is not the law of contracts. The exchange was not a principal in these transactions, it had explicitly disclaimed any counterparty status, and the electric power was not the property of the exchange. The exchange simply acted as a broker and passed the sales proceeds to the sellers who provided the power. My colleagues err in holding that the exchanges alone are liable for payment of the overcharges that were charged by the federal sellers of power.

The court is correct that claims against the BPA and WAPA are separate from the FERC statutory jurisdiction. The BPA and the WAPA were not obligated to sell power in areas covered by the CalPX and ISO, but, in choosing to do so, they agreed, as a condition of their participation in that market, to be held to the rules and price-setting mechanisms of the FERC-regulated tariffs. In doing so, the BPA and the WAPA agreed to the *Memphis* clause, which my colleagues hold has no role in the resolution of this case. Maj. Op. at 21. The majority correctly states that the *Memphis* clause does not serve as a "source of any contractual obligation between market participants,"

*id.*, but this means only that prices charged under the tariff contract are not "fixed," but rather are subject to review and change by FERC. These are the prices charged by suppliers like the BPA and the WAPA to the consumers like PG&E, through the CalPX and ISO.

The *Memphis* clause binds the price charged to FERC determinations; the tariff binds the parties to use the CalPX and ISO for sale/purchase of energy; the parties, conducting sales through the CalPX and ISO to purchase/supply energy amongst themselves, are bound to each other through their market transactions, the rules of the tariff, and the FERC regulations. "When a contract provides that its terms are subject to a regulatory body, all parties to that contract are bound by the actions of the regulatory body." *Alliant Energy v. Neb. Pub. Power Dist.*, 347 F.3d 1046, 1050 (8th Cir. 2003). *See Inter-City Gas Corp. v. Boise Cascade Corp.*, 845 F.2d 184, 187 (8th Cir. 1988) (holding that parties to a contract which provided that its rates "may be approved, ordered or set by any valid law, order, rule or regulation of any . . . regulatory authority . . . having jurisdiction," were bound by a FERC rate determination, even though they were not directly subject to FERC's jurisdiction). The sellers and buyers of power achieved privity through the sale and purchase of electricity, brokered by the exchange.

FERC has the statutory authority to determine the "just and reasonable" rate on and after the Refund Effective Date, and all parties had previously agreed to be bound by such rates. The Ninth Circuit recognized that FERC could not order the United States to pay these mandated refunds. *Bonneville Power Admin. v. FERC*, 422 F.3d 908, 926 (9th Cir. 2005). This is where the Tucker Act comes in, for this contractual obligation between the federal power sellers and the state purchasers.

### (b)  Other Tucker Act Authority

In addition to the contractual relation between the Power Administrators, as sellers, and the Appellants, as buyers, the Tucker Act also provides remedy on a Constitution-based theory of property taking, just compensation, and/or illegal exaction.  An illegal exaction arises when "the plaintiff has paid money over to the Government, directly or in effect, and seeks return of all or part of that sum" that "was improperly paid, exacted, or taken from the claimant in contravention of the Constitution, a statute, or a regulation." *Eastport S.S. Corp. v. United States*, 372 F.2d 1002, 1007 (Ct. Cl. 1967).  This cause arises when "some specific provision of law commands expressly or by implication the payment of money, upon proof of conditions he is said to meet." *City of Manassas Park v. United States*, 633 F.2d 181, 183 (Ct. Cl. 1980).

When overcharges were made and required by the government, this may support a takings claim.  And when the overcharges were designated by FERC as illegal and repayment was ordered, their exaction became illegal.  On either theory, the Fifth Amendment provides for recovery of the overpayment.  Even on the theory that there was no contractual relationship between the federal power sellers and the state power buyers, repayment of the overcharge is required, for it is not disputed that "the Government has the citizen's money in its pocket," money to which the government concedes it has no right. *Clapp v. United States*, 117 F. Supp. 576, 580 (Ct. Cl. 1954).

The claimant must demonstrate that the statute or provision causing the exaction provides, either expressly or by "necessary implication," that "the remedy for its violation entails a return of money unlawfully exacted." *Cyprus Amax Coal Co. v. United States*, 205 F.3d 1369, 1373 (Fed. Cir. 2000). The Power Administrators imposed an "unjust and unreasonable" price on the appellants,

who "paid money over to the Government, . . . and seek[] return of all or part of that sum" that "was improperly paid . . . in contravention of [statute and regulation]." *Eastport S.S. Corp.*, 372 F.2d at 1007. This standard is met here, and the remedy laid out by statute is refund of the overpayment.

The court has previously addressed similar issues. In *Ontario Power Generation, Inc. v. United States* this court recognized that "there are some circumstances under which jurisdiction exists even though the plaintiff did not pay money directly to the government." 369 F.3d 1302 (Fed. Cir. 2004). In *Camellia Apartments, Inc. v. United States*, 334 F.2d 667 (Ct. Cl. 1964), the court held that Tucker Act jurisdiction existed even though the plaintiff had not paid the exacted sums directly to the government. In that case, the Federal Housing Administration required that the plaintiff pay a "prepayment premium charge" to its mortgagees as a precondition to refinance its properties with private lenders. *Id.* at 669. The mortgagees then transmitted the premium to the Federal Housing Administration. In rejecting the government's motion to dismiss for lack of jurisdiction, the court said:

> The fact that the FHA acted through the mortgagees in requiring the payments of which plaintiffs complain is immaterial; under the pertinent regulation, the mortgagees were required to collect these funds and to remit them to the Commissioner. Therefore, we do not think that defendant can seriously deny plaintiffs' allegation that the mortgagees acted solely as the FHA's agents in so doing.

*Id.* Similarly here, the BPA and the WAPA collected the overcharges through the CalPX and ISO. "Under decisions of the Supreme Court and this court, a compensable taking does not occur unless the government's actions on

the intermediate third party have a 'direct and substantial' impact on the plaintiff asserting the takings claim." *Casa De Cambio Comdiv S.A. De C.V. v. United States*, 291 F.3d 1356, 1361 (Fed. Cir. 2002). It cannot be denied that the retention of the "unjust and unreasonable" rate charges by the government has, and continues to have, a "direct and substantial impact" on the Appellants.

Whether under either a theory of contract or taking, the Court of Federal Claims has jurisdiction of this claim against the government, as it initially held.

### *Conclusion*

It is contrary fundamental law to exclude this claim from access to judicial review and remedy. "The government of the United States has been emphatically termed a government of laws, and not of men. It will certainly cease to deserve this high appellation, if the laws furnish no remedy for the violation of a vested legal right." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 163 (1803). The judicial obligation and authority is to remedy the "unjust and unreasonable" rate charges as determined by FERC and confirmed on Ninth Circuit review. The remedy is assigned to the Court of Federal Claims and to the Federal Circuit.

I respectfully dissent from the court's rejection of that assignment.